[No. 23133-6-II. Division Two. September 3, 1999.]

*In the Matter of the Estate of* SAMUEL C. MUMBY.

DARLENE WOOD, *Appellant*, v. JAMES CALDWELL, ET AL., *Respondents.*

386

*Joanne Henry* of *Vandeberg Johnson & Gandara*, for appellant.

*Mark Stephen Beaufait* of *Mark S. Beaufait P.S.*, for respondents.

ARMSTRONG, J. — Darlene Wood, the daughter of Dr. Samuel Mumby, petitioned to invalidate his living trust on grounds that James Caldwell, the executor and a beneficiary, exerted undue influence. Caldwell counterclaimed that the "no contest" clause barred Wood from taking as a beneficiary. The trial court held that the trust was properly executed and enforced the no contest provision. The court also concluded that the trust provided for estate taxes to be paid from the estate, rather than charged to each beneficiary. On appeal, Wood argues the trial court erred in: (1) concluding the trust was not the product of fraud;[1] (2) enforcing the no contest provision of the trust; and (3) concluding that the trust provides for estate taxes to be paid from the estate, rather than apportioned among beneficiaries. Finding no error, we affirm.

## FACTS

Dr. Samuel Mumby, Jr., died on January 12, 1997, at the

---

[1]Although Wood argued in her appellate brief that the trial court erred in concluding the trust was not the product of undue influence, she conceded at oral argument that the trial court properly decided this issue. Accordingly, we do not review her claim of undue influence.

age of 94. His only daughter, Darlene Wood, and four grandchildren survived him. James and Erma Caldwell were long-time friends and next door neighbors of Dr. Mumby.

At the time of his death, Dr. Mumby possessed a substantial estate consisting of 44 acres of property on Marrowstone Island and liquid assets of approximately one-half million dollars. In January 1992, Dr. Mumby executed a will, a quit claim deed, and a durable power of attorney. The quit claim deed conveyed approximately 38 acres of wooded property to the Caldwells. The will left the balance of the estate to Wood. In November 1995, Dr. Mumby executed a living trust and pour-over will.[2] The trust again provided that the Caldwells would receive the 38-acre parcel of property, in addition to a $20,000 cash bequest. Dr. Mumby left his residence, a six-acre waterfront parcel, and the residue of the estate to his daughter, Wood.[3] The pour-over will and trust named James Caldwell as executor and trustee.

In May 1997, Wood filed a petition to rescind the trust, alleging that James Caldwell exercised undue influence over Dr. Mumby. The Caldwells counterclaimed that the no contest provision in the trust barred Wood from taking as a beneficiary. At trial, the deadman's statute precluded the Wood family and the Caldwells from testifying as to conversations and transactions with Dr. Mumby. But numerous witnesses testified about Dr. Mumby's relationships, the circumstances surrounding the execution of the will and trust, and his expressed intentions regarding his property.

Wood had limited contact with her father during her youth, but their relationship became close during the last several years of his life. Dr. Mumby, Wood, and her children traveled as a family on numerous occasions and spent

[2]"Pour-over" is defined as: "Provision in a will which directs the distribution of property into a trust." BLACK'S LAW DICTIONARY 1169 (6th ed. 1990).

[3]Wood was also the direct remainder beneficiary of a family trust fund valued at approximately $175,000.

holidays together. From 1992 until Dr. Mumby's death, Wood visited her father approximately once a week to help around the house, run errands, and take him to lunch.

Although Wood testified that she had a close relationship with her father, there was evidence of some tension. Dr. Mumby told numerous people that he was angry with Wood and her husband for asking him to cosign a $250,000 promissory note needed to refinance a FmHA loan on their farm. Because he did not want to be placed in financial jeopardy, Dr. Mumby refused to sign the note. The attorney who prepared his trust documents testified that Dr. Mumby did not feel his daughter supported, visited, or cared for him as much as he would like. Finally, Dr. Mumby apparently believed that his daughter would clear-cut the timber if she received the 38-acre parcel of wooded property.

Dr. Mumby was very close with the Caldwells, his next door neighbors. In 1976, Dr. Mumby sold his neighboring property to the Caldwells. Thereafter, James Caldwell regularly helped Dr. Mumby with chores such as splitting wood, mowing grass, assembling paperwork, cutting his hair, and driving him into town. Erma Caldwell was also helpful and friendly with Dr. Mumby. She visited him about once a week, cooking for him, providing him with desserts, and mending his clothes.

In addition to his family and the Caldwells, Dr. Mumby had a close friendship with Carl Johnson. From 1990 until Dr. Mumby's death, Johnson and his son Jake lived in the upper portion of Dr. Mumby's home. The Johnsons checked in with Dr. Mumby each day, often made him lunch, and kept him company. Over the years, the Johnsons helped Dr. Mumby maintain his house to contribute to their "rent." Because of the combined assistance of the Caldwells and the Johnsons, Dr. Mumby was able to live in his own home up to the time of his death.

In summer 1995, the Caldwells referred Dr. Mumby to Earnest Dill for "asset management" services. After several meetings, Dr. Mumby purchased a living trust from Dill. The dispositive provisions of the trust were identical

to Dr. Mumby's 1992 estate plan. Dill testified that Dr. Mumby's primary purpose for executing the trust was to "tighten up his estate plan" against a challenge by Wood. To this end, the trust contained a no contest clause, which was virtually identical to the no contest clause in his 1992 will. Dill's associate, attorney Thomas Brothers, prepared the trust package. Because of Dr. Mumby's advanced age, Brothers was initially concerned about his competence. But Brothers testified that Dr. Mumby spoke lucidly and clearly and understood the nature and extent of his assets. Dr. Mumby signed his living trust on November 29, 1995.

Shortly after the execution of the trust, Wood was informed of Dr. Mumby's planned gift of the property to the Caldwells. Wood then contacted her cousin, John Sangster, to investigate and attempt to disinherit the Caldwells. Wood hired an attorney and a private investigator with a view to initiating a will contest and a guardianship proceeding against her father.

Beginning in early 1996, Sangster met with Dr. Mumby eight times in an attempt to persuade him to change his estate plan. Once it became clear that Dr. Mumby did not intend to change his mind about giving the property to the Caldwells, Sangster tried to help him with his estate planning. Because Dr. Mumby's estate faced substantial estate taxes, Sangster suggested placing a "conservation easement" on the wooded property, which involved deeding the logging and development rights to the Jefferson Land Trust. Sangster explained that the easement would reduce the value of the property, save approximately $150,000 in estate taxes, and protect the property from logging. Although Sangster arranged a meeting with Jefferson Trust representatives, Dr. Mumby ultimately decided against encumbering the property.

Dr. Mumby remained firm in his expressed intention to leave the 38-acre parcel to the Caldwells, even without the conservation easement in place. Four days before his death, Wood persisted, "Father it's not too late to change your Will[,]" but Dr. Mumby stated that he did not wish to change anything.

The trial court ruled that there was no undue influence and that Dr. Mumby was competent to execute the living trust and pour-over will. Finding no valid basis for Wood's challenge, the court applied the no contest clause and ruled that Wood should take nothing under the trust document. Consequently, the property that would have gone to Wood under the trust was distributed to her children. Finally, the court concluded that the trust specifically directed that estate taxes be paid from the estate, rather than apportioned among beneficiaries.

Wood moved for reconsideration and raised, for the first time, the issue of fraudulent inducement. Although the issue was not pleaded, briefed, nor argued at trial, the court nevertheless considered the issue. The court denied the motion, finding that "[t]he testimony did not begin to establish that theory."

## ANALYSIS
### A. Fraud

Wood argues that the trial court erred in failing to find that Caldwell fraudulently induced Dr. Mumby into leaving him the 38-acre parcel of property. We disagree.

■ "The right of testamentary disposition of one's property as an incident of ownership, is by law made absolute." *In re Estate of Martinson*, 29 Wn.2d 912, 913, 190 P.2d 96 (1948). Thus, to establish fraud and set aside a will, the contestant must present "clear, cogent, and convincing" evidence of all of the elements of fraud. *In re Estate of Lint*, 135 Wn.2d 518, 533, 957 P.2d 755 (1998). "To sustain an order premised upon clear, cogent and convincing evidence, the ultimate fact in issue must be shown by evidence to be 'highly probable.' " *In re Estate of Pfleghar*, 35 Wn. App. 844, 847, 670 P.2d 677 (1983) (citations omitted).

"[W]here a will is attacked because allegedly induced by fraud, it may be avoided, not because the testator's mind was coerced, but because his mind was deceived." *In re Estate of Bottger*, 14 Wn.2d 676, 701, 129 P.2d 518 (1942).

In the context of a testamentary disposition, the elements of fraudulent inducement are:

(1) representation of an existing fact; (2) materiality of the representation; (3) falsity of the representation; (4) knowledge of the falsity or reckless disregard as to its truth; (5) intent to induce reliance on the representation; (6) ignorance of the falsity; (7) reliance on the truth of the representation; (8) justifiable reliance; and (9) damages.

*Lint,* 135 Wn.2d at 533 n.4 (citing *Farrell v. Score,* 67 Wn.2d 957, 958-59, 411 P.2d 146 (1966)).

Wood contends that Caldwell made two false statements to Dr. Mumby that induced him to create the trust and leave the property to the Caldwells. First, Wood argues that Caldwell falsely told Dr. Mumby that, if he gave Wood the 38-acre parcel of property, she would clear-cut the timber. Second, Wood contends that Caldwell advised Dr. Mumby that, if he cosigned the $250,000 promissory note, he could "lose everything." Although the record contains contradictory evidence, the trial court did not err in finding that Wood failed to establish fraud by clear and convincing evidence.

Dr. Mumby apparently believed that Wood did not intend to preserve the natural state of his wooded property. But the source of this belief is not entirely clear. At trial, Diane Wood, Wood's close friend, was the only witness who claimed Dr. Mumby attributed his opinion to Caldwell. The remaining witnesses who testified that Dr. Mumby believed Wood would log the trees did not know the source of his belief. Sangster, Goetz, Johnson, and Dill all testified that Dr. Mumby believed Wood would log his property, but they did not testify *why* Dr. Mumby believed this. Even assuming Caldwell made this statement to Dr. Mumby, Wood presented no evidence establishing its falsity or Caldwell's knowledge of such falsity. Further, although Wood apparently favored placing a "conservation easement" on the wooded property, the trial court was not obliged to accept this testimony.

Concerning the promissory note, Wood concedes that she and her husband asked Dr. Mumby to cosign the note. But Wood argues that "Dr. Mumby stood to lose nothing on the promissory note, because he never signed it[.]" Wood's argument ignores the fundamental issue: whether Caldwell falsely represented an existing fact. The record clearly shows that the Woods asked Dr. Mumby to cosign their note and that Dr. Mumby was angry about this request. But Wood has not established that Caldwell expressed anything other than his *opinion* to Dr. Mumby. And because the exact nature of Dr. Mumby's liability under the note was not addressed, Wood did not present clear and convincing evidence of the falsity of the statement.[4] Accordingly, we hold that the trial court correctly concluded that Wood failed to present clear and convincing evidence of fraud.[5]

## B. No Contest Provision

Wood argues that the trial court improperly enforced the "no contest" provision, as she brought the contest in good faith and with probable cause.[6] We find no error.

■ ■ In Washington, no contest clauses are valid and enforceable. *Boettcher v. Busse*, 45 Wn.2d 579, 585, 277 P.2d 368 (1954) (citing *In re Estate of Chappell*, 127 Wash. 638, 221 P. 336 (1923)). But the no contest or forfeiture clause does not operate where the contest is brought in good faith and with probable cause. *See id.* at 646; *see also In re Estate of Kubick*, 9 Wn. App. 413, 419-20, 513 P.2d 76 (1973). If a contestant initiates an action on the advice of counsel, after fully and fairly disclosing all material facts, she will be deemed to have acted in good faith and for probable cause as a matter of law. *Id.* at 420.

---

[4]Wood apparently concedes the partial truth of the statement: "The requested promissory note was for $250,000, for had the Woods defaulted in total, which was unlikely, that was Dr. Mumby's exposure."

[5]Because Wood failed to establish an essential element of her fraud claim, we do not address her other challenges to the trial court's factual findings.

[6]The no contest clause provides: "should anyone contest this Living Trust document or the Trustees [sic] interpretation, the contestor shall not receive any benefits under this Trust document."

Here, Wood contends that because she consulted an attorney before filing suit she must be deemed to have acted in good faith and with probable cause. But the trial court reviewed the declaration of Wood's counsel and concluded to the contrary. "To a large degree the declaration of counsel . . . simply resubmits the facts testified at trial in a light most favorable to Petitioner Wood's position."

The record supports the trial court's conclusion that Wood did not fully and fairly disclose all material facts. For example, counsel declared that "[Wood's] father was subject to and felt dependent upon Mr. Caldwell, had little contact with other people, drank consistently, retreated daily to his bed to sleep it off, and that his memory was diminishing, as were his eyesight and hearing." But Wood apparently failed to disclose that the Johnsons resided in Dr. Mumby's home and visited him on a daily basis and that Dr. Mumby retained full control of his finances and health care decisions until his death. And Wood did not fully disclose the degree of Dr. Mumby's affectionate relationship with the Caldwells. Further, it is not clear whether Wood informed counsel of her attempts to disinherit the Caldwells and Dr. Mumby's consistent resistance.

Because Wood did not fully and fairly disclose all material facts to counsel, she is not entitled to a presumption of good faith. Thus, we must next determine whether the trial court properly concluded that Wood acted in bad faith and without probable cause.

■ Bad faith has been defined as " 'actual or constructive fraud' or a 'neglect or refusal to fulfill some duty . . . not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.' " *Bentzen v. Demmons*, 68 Wn. App. 339, 349 n.8, 842 P.2d 1015 (1993) (quoting *State v. Sizemore*, 48 Wn. App. 835, 837, 741 P.2d 572 (1987)). In its findings of fact, the trial court found:

Petitioner Darlene Wood wanted all of Dr. Mumby's property,

and specifically wanted to have Dr. Mumby disinherit the Caldwells despite Dr. Mumby's stated desire to give the 38 acres of forest land to the Caldwells. Given the great weight of the testimony and knowledge of the witnesses concerning Dr. Mumby's independence, competency, resistance to influence, and consistent intent and the history of the relationship with the Caldwells, the court finds that as a factual matter Darlene Wood's efforts to disinherit the Caldwells and her bringing this trust contest were not in good faith, not based on probable cause, and thus were in bad faith.

We find no error in the trial court's conclusion that Wood acted in bad faith. All of the independent witnesses testified that Dr. Mumby was competent and exercised his own judgment until his death. Moreover, Dr. Mumby's expressed intent was consistent from his 1992 will through the 1995 trust to his death—he wanted the Caldwells to have the 38 acres. The trial court did not err in enforcing the no contest clause.

## C. Estate Taxes

Wood next contends that the estate taxes must be apportioned among the specific beneficiaries, rather than charged against the residue of the estate. Because the trust provides otherwise, we disagree.

██ In 1986, Washington adopted the Uniform Estate Tax Apportionment Act, RCW 83.110.010-.0904. Prior to the enactment of the Apportionment Act, if the testator or trustor failed to specify a source of payment, estate taxes were charged against the entire estate as an expense of administration. See In re Estate of Williamson, 38 Wn.2d 259, 267-68, 229 P.2d 312 (1951); Seattle-First Nat'l Bank v. Macomber, 32 Wn.2d 696, 700-01, 203 P.2d 1078 (1949). But RCW 83.110.020 now provides for specific apportionment of estate taxes when the testator or trustor fails to specify another source of payment.

[U]nless the will, trust, or other dispositive instrument otherwise provides, the tax . . . shall be apportioned among

all persons interested in the estate. . . . in the proportion that the value of the interest of each person interested in the estate bears to the total value of the interests of all persons interested in the estate.

RCW 83.110.020(1).

A trustor may exempt certain bequests from taxes and require other beneficiaries to carry the tax burden. But unless this intent is specifically expressed in the trust, the imposition of estate taxes is governed by law. *In re Estate of Wilson*, 8 Wn. App. 519, 522, 507 P.2d 902 (1973) (citing *In re Estate of Eberle*, 4 Wn. App. 638, 644, 484 P.2d 478 (1971)). Because RCW 83.110.020 is inapplicable if the trust provides otherwise, we must consider the language of the trust, which provides:

> Upon the death of the original Trustor, the Trustee is directed to pay all legal debts (except unmatured mortgages and/or Trust Deeds on real estate) and all expenses of the last illness, funeral and burial as well as all estate, inheritance, succession or other death taxes imposed upon, or in relation to any property required by any tax law to be included in the gross Estate, *and then distribute the remaining assets* of the Estate including any accumulation thereon in the following manner[.]

(Emphasis added.) This paragraph is immediately followed by the specific devises of real estate and the gift of the residue.

Wood argues that the language of the Mumby trust is not an accurate expression of the trustor's intent to shift the tax burden to the residue. She argues that the language is similar to the tax clause reviewed in *In re Estate of Henderson*, 46 Wn.2d 401, 281 P.2d 857 (1955), which failed to shift the inheritance tax burden from statutory apportionment to the residue of the estate.[7] There, the testator devised specific real estate to her niece, with the residue

---

[7]Former RCW 83.08.060 (repealed by LAWS OF 1981, 2d Ex. Sess., ch. 7) provided that "[t]he [inheritance] taxes imposed and the exemption with respect to each class of beneficiaries shall be apportioned between the beneficiaries in

passing to others "after payment of all of my just debts, *taxes*, and costs of administration." *Id.* at 401. Based on this language, the Supreme Court reversed the trial court's conclusion that the inheritance tax on the specific devise should be paid from the residue of the estate. *Id.* at 402.

Although *Henderson* illustrates of the degree of specificity with which a testator must state his or her intentions, it is distinguishable. To understand why it is distinguishable it is necessary to review the difference between an estate tax and an inheritance tax. "An estate tax is a tax upon the transfer of property by the decedent upon his death[.]" *Macomber*, 32 Wn.2d at 700. When *Henderson* was decided, "[t]he estate tax [was charged against] the entire estate, payable as an expense of administration, and not [against] the particular devise, bequest, or distributive share of the individual beneficiary." *See Macomber*, 32 Wn.2d at 700. In contrast, an inheritance tax "is a tax upon the taking of property by a beneficiary or distributee." *Id.*

Because the dispute in *Henderson* involved inheritance taxes, rather than estate taxes, the court said, "A mere statement that the testator desires *his taxes* to be paid does not clearly express an intention to charge his estate with taxes imposed by law upon a beneficiary." *See Henderson*, 46 Wn.2d at 402 (emphasis added). Thus, the court's focus in *Henderson* was on the language "my . . . taxes" not on the use of the word "*after*" the payment of "my taxes," as Wood contends. *See Wendland v. Washburn Univ.*, 8 Kan. App. 2d 778, 667 P.2d 915, 918 (1983).

In *In re Estate of Ogburn*, 406 P.2d 655 (Wyo. 1965), the Wyoming Supreme Court made the same distinction. The tax clause in *Ogburn*, which was followed by specific devises and bequests, provided: "FIRST: I direct the payment of all *my* just debts, taxes, funeral expenses, and expense of administration of *my estate*." *Id.* at 657 (emphasis added). This clause was found to be sufficient to shift the federal

such class in proportion to the amount receivable by such beneficiary." The current statute at issue involves apportionment of *estate* taxes.

estate tax burden from statutory apportionment, but was not sufficient to shift the burden with respect to state inheritance taxes. *Id.* at 657-59, 661-62; *see also Wendland,* 667 P.2d at 918; *In re Estate of Grondin,* 98 N.H. 313, 100 A.2d 160, 163 (1953). With respect to estate taxes, the *Ogburn* court found it significant that the tax clause was included "in the usual ritualistic and introductory portion of the will directing payments of debts, expenses, et cetera, which when possible are ordinarily satisfied from the residuary estate." *Ogburn,* 406 P.2d at 659.

The problem here, as in *Ogburn,* is that Dr. Mumby gave a general directive to pay taxes but failed to specify the fund from which the taxes should be paid. The vast majority of courts in other jurisdictions have concluded that when the nonspecific tax clause is grouped along with a provision for the payment of debts and other expenses of administration of the estate, the result is to shift the tax burden to the same fund designated by state law to pay the debts and expenses of the estate. *In re Estate of King,* 278 N.W.2d 171, 173-74 (S.D. 1979); Maurice T. Brunner, Annotation, *Construction and Effect of Will Provisions Expressly Relating to the Burden of Estate or Inheritance Taxes,* 69 A.L.R.3D 122 § 42(c) (1976); *see e.g., Lynchburg College v. Central Fidelity Bank,* 242 Va. 292, 298-99, 410 S.E.2d 617 (1991); *Ogburn,* 406 P.2d at 659; *Brodie v. De-Vatz,* 556 S.W.2d 444, 445 (Ky. 1977); *University of Louisville v. Liberty Nat'l Bank & Trust Co.,* 499 S.W.2d 288, 289 (Ky. 1973); *Succession of Jones,* 172 So. 2d 312, 315-16 (La. Ct. App. 1965); *Thomas v. Fox,* 348 Mass. 152, 202 N.E.2d 912, 912-13 (1964); *In re Estate of Leonard,* 16 Misc. 2d 465, 184 N.Y.S.2d 552, 553 (1959); *Gratz v. Hamilton,* 309 S.W.2d 181, 183 (Ky. 1958); *Gaither v. Unites States Trust Co.,* 230 S.C. 568, 97 S.E.2d 24, 26 (1957); *Baylor v. National Bank of Commerce,* 194 Va. 1, 72 S.E.2d 282, 284 (1952); *In re Will of Cudahy,* 251 Wis. 116, 28 N.W.2d 340, 341 (1947); *In re Will of Hund,* 266 A.D. 379, 42 N.Y.S.2d 505, 506-07 (1943); *Morris v. Dosch,* 194 Ark. 153, 106 S.W.2d 159, 160 (1937); *Starr v. Watrous,* 116 Conn. 448, 165 A. 459, 460 (1933); *see also Estate of Semmes,* 288 F.2d 664, 665 (6th

Cir. 1961); *but see Wright v. Union Nat'l Bank*, 307 Ark. 301, 819 S.W.2d 698, 702 (1991); *Ferrone v. Soffes*, 558 So. 2d 146, 147 (Fla. Ct. App. 1990); *Johnson v. Hall*, 283 Md. 644, 392 A.2d 1103, 1108 (1978) (leading minority case); *cf. First Nat'l Bank v. McGill*, 180 W. Va. 472, 377 S.E.2d 464, 464-70 (1988) (involving state inheritance tax). "In most cases, these expenses are a charge against the general estate and hence have the practical effect of reducing the residuary estate." *King*, 278 N.W.2d at 174; Brunner, *supra* 69 A.L.R.3D 122 § 42(c). Absent evidence of contrary intent from the testator, this is also the case in Washington. *See Williamson*, 38 Wn.2d at 267; *Macomber*, 32 Wn.2d at 700.

Courts have also emphasized the importance of the sequence or order of arrangement of the provisions of the will in determining a testator's intent. *See University of Louisville*, 499 S.W.2d at 289; *In re Estate of Keller*, 134 Cal. App. 2d 232, 236, 242, 286 P.2d 889 (1955); *Baylor*, 72 S.E.2d at 283, 286; *In re Will of Cudahy*, 28 N.W.2d at 341; *Starr*, 165 A. at 460; *see also In re Estate of Crozier*, 105 N.H. 440, 201 A.2d 895, 896-97 (1964). For example, in *University of Louisville*, the first clause of the will provided for the payment of "all Federal and State estate and inheritance taxes assessed against my estate and all beneficiaries therein named." *University of Louisville*, 499 S.W.2d at 289. The second, third, and fourth clauses made specific bequests, and the fifth clause provided for disposition of the residue. *Id.* The court said, "The sequence or order of arrangement of the will's clauses naturally indicates that the residue, disposed of in Clause No. 5, will consist of what remains after the previous four clauses have been complied with." *Id.* Similarly, in *Keller*, the court said, "[U]nless some contrary design is apparent, what could be more logical in applying rules of interpretation than to say that each subsequent provision in a will must be considered in the light of that which has gone before." *Keller*, 286 P.2d 891.

Here, Dr. Mumby specifically directed the trustee to pay "all estate, inheritance, succession or other death taxes

imposed upon, or in relation to any property required by any tax law to be included in the gross Estate, and then to distribute the remaining assets in the manner described in the trust." This is more than a mere statement that Dr. Mumby wanted his taxes paid as in *Henderson*. Dr. Mumby wanted "all estate, inheritance, succession or other death taxes" paid and then the *remaining* assets distributed. In addition, he grouped taxes along with debts and other expenses of administration. Finally, he placed the tax clause in the first paragraph of the dispositive provisions of the trust. This was followed by the specific gifts of property and then the gift of the residue. Although the tax clause could have been more specific against apportionment, the language of the trust, the grouping of taxes with debts and expenses, and the sequence of the trust provisions demonstrate that Dr. Mumby intended that the estate taxes be paid out of the corpus of the trust. Therefore, we hold that the language of the trust is sufficient to avoid the application of RCW 83.110.020. Thus, the trial court did not err in ruling that the trust provides for estate taxes to be paid from the general estate, rather than apportioned among the beneficiaries.

Affirmed.

BRIDGEWATER, C.J., and MORGAN, J., concur.