FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2016 SEP -6 AM 9: 04



# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Estate of<br><br>ELIZABETH K. WAGNER,<br><br><br>ELMER R. WAGNER, as beneficiary,<br><br>Appellant/Cross Respondent,<br><br>v.<br><br>JILL WRIGHT a/k/a JILL ARCHER, as Personal Representative and as beneficiary to the Estate of Elizabeth K. Wagner; JILL WRIGHT a/k/a JILL ARCHER, and JOHN DOE ARCHER, and the marital community composed thereof,<br><br>Respondent/Cross Appellant. | No. 73629-9-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION<br><br><br><br><br><br><br><br><br>FILED: September 6, 2016 |

APPELWICK, J. — Elizabeth died in 2010. Her daughter, Jill, was appointed

personal representative of her estate. Elizabeth's surviving husband, Elmer,

disagreed with Jill's distribution of assets and management of the estate. He

brought a TEDRA action to remove Jill and to settle these issues. Jill defended on

the grounds that by typing Elizabeth's will, Elmer engaged in the unauthorized

practice of law and asserted undue influence over Elizabeth. The trial court denied

Elmer's request to remove Jill as personal representative and Jill's claims of unauthorized practice of law and undue influence. It imposed a community lien on the house in favor of Elmer, and determined that the remaining proceeds from the sale of Elizabeth's house and from Elizabeth's oil and mineral rights should be divided equally amongst the beneficiaries. We affirm.

FACTS

Elizabeth Wagner and Elmer Wagner were married on July 27, 1989. Both had children from previous marriages. Elizabeth's[1] children were Jill Archer,[2] Todd Kulesza, and Kurt Kulesza.

In the early 2000s, Elizabeth was diagnosed with COPD (chronic obstructive pulmonary disease). Elizabeth remained as active as she could, although she became weaker and needed to be on oxygen.

In 2009, Elizabeth wanted to revise her will. Elmer assisted her by typing the will on the computer, but Elizabeth made edits to a printed copy until she was satisfied with the will. Elizabeth gave Jill a draft of the will for her to review the changes she had made. Then, she executed the will on August 26, 2009.

Like her previous will, Elizabeth's will contained a provision stating, "Both my husband, Elmer, and I agreed prior to our marriage that assets owned prior to our marriage would be willed to our respective children per each of our individual choice." Specific bequests of Elizabeth's separate property followed this provision. The will gave Elmer a life estate in Elizabeth's house at 30326 10th Avenue South,

---

[1] For clarity and consistency, we refer to the parties and their family members by their first names. No disrespect is intended.
[2] Jill is also known as Jill Wright.

2

Federal Way, WA (the Federal Way home). It provided that if the life estate terminated before Elmer's death, the total net proceeds of the sale were to be divided equally amongst Elizabeth's children and Elmer. Each would receive one-fourth of the home's value after expenses. Elizabeth gave the residue of her estate to Elmer. And, Elizabeth appointed her daughter, Jill, as personal representative.

Unlike the previous will, Elizabeth's 2009 will stated that proceeds from the "Tvedt/Murphy trust" were to be held in trust by Elizabeth's oldest living child and divided equally amongst Elizabeth's children and Elmer.

Elizabeth died on July 21, 2010, survived by her children and her husband. Jill's petition to have Elizabeth's will admitted to probate was granted, and Jill received letters testamentary on September 1, 2010.

Before Elizabeth's death, she and Elmer lived in the Federal Way home. Elmer continued to live in the home until 2012. After he vacated the home, the estate sold it.

The estate's attorney advised Jill that she had a one-third interest in the Federal Way home. Acting on this advice, Jill divided one-third of the proceeds from the sale equally amongst herself and her brothers. She split the remaining two-thirds evenly amongst herself, her brothers, and Elmer.

On April 15, 2013, Elmer filed a Trust and Estate Dispute Resolution Act (TEDRA) petition pursuant to chapter 11.96A RCW. He sought quiet title to the Federal Way house and rescission of documents executed by Jill. Elmer claimed that Jill breached her fiduciary duty, had been unjustly enriched, and had unlawfully

3

converted assets of the estate. And, he requested an accounting and the removal of Jill as personal representative of the estate.

Before trial, Elmer moved to bar Jill from introducing evidence to suggest that Elizabeth's will was invalid. He argued that Jill had admitted the will to probate asserting that it was a valid will, and therefore evidence suggesting that the will was invalid should be excluded. This motion was denied. In Jill's trial brief, filed April 15, 2014, she argued for the first time that Elmer could not take under the will, because he acted as counselor and lawyer for his wife when she executed it.

The case proceeded to trial. The court entered findings of fact and conclusions of law on June 13, 2014. The court found that there was no evidence that Jill breached her fiduciary duties, that Elmer acted as Elizabeth's attorney, or that Elmer exerted undue influence over Elizabeth. The court further found that Jill did not have an ownership interest in the Federal Way home, but that the value of the community's mortgage payments and improvements to the property supported a community/equitable lien. To the extent that the TEDRA action or Jill's counterclaims could be construed as a will contest, the court declined to apply the no contest clause of Elizabeth's will. And, the court found that the "Tvedt/Murphy trust" in Elizabeth's will referred to North Dakota properties, oil/mineral rights and deeds, and the proceeds generated from them, that she had inherited from her family.

Based on these findings, the court rejected Elmer's request to remove Jill as personal representative and denied Jill's counterclaims. The court concluded that the net proceeds from the sale of the Federal Way property should be

distributed in the amount of $52,143 to Elmer, to represent his share of the community lien, with the remainder divided equally among all four of the beneficiaries. And, the court concluded that all of Elizabeth's interests in the North Dakota properties belonged to the Tvedt/Murphy trust, and the proceeds generated from those properties would be divided equally among Jill, Todd, Kurt, and Elmer.

On December 12, 2014, the court held an evidentiary hearing to determine a final disbursement. Certified public accountant (CPA) Cary Deaton testified as to the accounting his firm prepared. The court adopted Deaton's accounting and ruled that the amount owed to Elmer would be paid out of the funds held in the court registry. But, the court did not enter a final order regarding distribution.

After the evidentiary hearing, the parties continued to contest the order of the distribution. The trial court ultimately entered a final judgment and order on June 5, 2015, which was amended on June 23, 2015. This order provided that the clerk would first release $2,692 from the court registry to pay the accounting firm. Then, $19,789 would be released to Elmer to offset the overpayments to the other beneficiaries. After that, all remaining funds were to be distributed 25 percent to Elmer and 75 percent to the estate.

Elmer appeals the order on his motions in limine, the June 13, 2014 findings of fact and conclusions of law and order on civil motion regarding fees, the August 4, 2014 order on disbursement of funds, and the final judgment and order. Jill cross appeals.

## DISCUSSION

Elmer contends that the trial court erred by considering Jill's claims of undue influence and unauthorized practice of law. Elmer asserts that Jill should have been removed as personal representative. And, Elmer argues that the trial court's disbursement of funds from the court registry deprived him of $4,947. Jill cross appeals on the grounds that the trial court erred in interpreting the deed to the Federal Way home as not granting her an interest in the home. She also argues that the trial court erred in imposing a community lien against the Federal Way property. Both parties seek attorney fees.

### I. Defenses to TEDRA Action

Much of the evidence produced at trial and the arguments made on appeal revolves around Elmer's role in drafting Elizabeth's will. Jill contends that the trial court erred in concluding that Elmer did not engage in the unauthorized practice of law or exercise undue influence over Elizabeth in the making of her will. Elmer argues that Jill should have been barred from raising these claims, because they constituted a will contest. And, he argues that because Jill brought a bad faith will contest, the trial court erred in not enforcing the no contest clause that would disinherit Jill.

### A. Undue Influence and Unauthorized Practice of Law

The trial court found that there was no evidence that Elmer exercised undue influence over Elizabeth or engaged in the unauthorized practice of law and therefore denied Jill's claims. Jill argues that the trial court erred in reaching these conclusions.

6

Not every influence exerted over a person can be called undue influence. In re Estate of Riley, 78 Wn.2d 623, 662, 479 P.2d 1 (1970). To support the invalidation of a will, the influence exerted over the testator must have been such that the will no longer reflects the intent of the testator. In re Estate of Bottger, 14 Wn.2d 676, 701, 129 P.2d 518, (1942). Certain facts may give rise to a presumption of undue influence, including: (1) the beneficiary had a fiduciary or confidential relationship with the testator, (2) the beneficiary actively participated in the preparation of the will, and (3) the beneficiary received an unusually large part of the estate. In re Estate of Smith, 68 Wn.2d 145, 153, 411 P.2d 879, 416 P.2d 124 (1966). Other factors may include the testator's age, health, and mental acuity, the nature of the relationship between the beneficiary and the testator, the opportunity for exerting undue influence, and the naturalness of the will. Id. This presumption may be overcome by rebuttal testimony. Id. at 153-54.

Here, Elmer had a close relationship with Elizabeth. They were married for over twenty years. He participated in the preparation of Elizabeth's will by typing up her wishes. And, he received a large portion of Elizabeth's estate—a life estate in her home, a life estate in the proceeds from her oil and mineral interests, her household effects, and all the residue of her estate. These factors could raise a presumption of undue influence.

But, the testimony of several witnesses rebutted such a presumption. Elmer's testimony showed that he was merely the scrivener in preparing Elizabeth's will. Elizabeth gave him the information in a handwritten form, and he typed her wishes exactly as she expressed them. Elizabeth reviewed and

corrected several drafts before she was satisfied. Afterward, Elizabeth sent drafts to her children so they would be aware of the changes. By all accounts, Elizabeth was mentally sharp and active in 2009, when the will was made. Jill testified that Elizabeth was sharp as a tack, and she knew her own mind. Elizabeth and Elmer's longtime friend, Harry Hoiland, testified that Elizabeth was strong-willed, and she would not let Elmer overpower her wishes. Based on this evidence, we conclude that trial court did not err in denying this claim.

Jill further argues that Elmer's assistance in crafting Elizabeth's will constituted the unauthorized practice of law, and the trial court erred in allowing Elmer to recover under the will. Jill points to this court's decisions in In re Estate of Marks, 91 Wn. App. 325, 957 P.2d 235 (1998) and In re Estate of Knowles, 135 Wn. App. 351, 143 P.3d 864 (2006) to argue that Elmer engaged in the unauthorized practice of law.[3]

But, these cases in fact show that Elmer did not act as a lawyer by typing up Elizabeth's will. In Marks, the decedent asked the friends with whom she was staying to help her make a will. 91 Wn. App. at 330-31. The trial court found that the decedent's friends engaged in the unauthorized practice of law by selecting a will kit, discussing the decedent's distribution of assets and whether it was fair, obtaining the inventory of investments, typing the will, and arranging for the signing

---

[3] As a preliminary matter, we note that the unauthorized practice of law is not a traditional means of challenging a will. The unauthorized practice of law may be enjoined civilly, and it is a criminal misdemeanor, but neither of those situations are applicable here. See Wash. State Bar Ass'n v. Great W. Union Fed. Sav. & Loan Ass'n, 91 Wn.2d 48, 61, 586 P.2d 870 (1978); RCW 2.48.180. Neither of the cases Archer cites requires us to hold that the unauthorized practice of law has any consequence in a will contest.

and witnessing of the will. Id. at 335. This finding was not challenged on appeal—the Court of Appeals made no holding regarding whether such actions constitute the unauthorized practice of law. See id. at 335-36. The court's holding was simply that the trial court did not err in voiding the portions of the will relating to the decedent's friends. Id. at 336.

In Knowles, one of Merle's sons, Randy, wrote the material provisions of Merle's will on a will form. 135 Wn. App. at 354. The will appointed Randy as personal representative and left him the majority of Merle's assets. Id. at 354-55. After Merle died, his other children argued that Randy was barred from taking under the will because Randy was practicing law when he drafted the will. Id. at 355-56. The Knowles court explicitly disagreed with Marks to the extent it held that simply completing a will form is the practice of law. Id. at 364-65. Instead, the Court of Appeals noted that a person practices law by directly or indirectly giving advice. Id. at 365. And, in Knowles, the decedent's son did nothing more than fill in the form as the decedent wished. Id. at 364. The court held that this falls short of practicing law. Id.

Here, Elmer's uncontroverted testimony was that he merely typed up the will as Elizabeth instructed. He stated that he did not add or take out a single thing that she did not want. He clarified that Elizabeth used her own form to make her will. Elmer typed the information Elizabeth gave him, and Elizabeth read a printed copy and made edits until she was satisfied with the will.

We hold that merely typing up another person's will does not constitute the unauthorized practice of law. Elmer did not offer advice about the form or contents

9

of Elizabeth's will. There was no evidence at trial that he did anything other than put Elizabeth's wishes into writing. And, to the extent that Jill argues Elmer should have taken Elizabeth to a lawyer rather than assist her himself, we hold that Washington law does not impose a duty on a spouse to ensure the other spouse consults a lawyer about a will.

Based on the evidence at trial, we hold that the trial court did not err by denying Jill's defenses.

## B. Will Contest and No Contest Clause

Having considered the defenses asserted by Jill, we conclude they were not defenses necessary to the interpretation or administration of the will, as the trial court found. They were challenges to the validity of the will itself. Though not labeled as a will contest, the assertion of these defenses was just that. See In re Estate of Finch, 172 Wn. App. 156, 159, 162, 294 P.3d 1 (2012) (holding that "[a] court may treat a motion as a will contest, even where the petitioner styles it otherwise"); In re Estate of Palmer, 146 Wn. App. 132, 135-37, 189 P.3d 230 (2008) (holding that a motion to disqualify trust beneficiaries on the basis of unauthorized practice of law was, in all important respects, a will contest). The outcome of this case would have been the same had the trial court granted Elmer's motion in limine and excluded the defenses as a will contest. However, allowing these defenses contributed to the protracted litigation and expense and impacted the equities to some degree.

Elmer argues that because Jill's defenses constituted a will contest, Jill was time barred from raising them.[4] And, he asserts that they were factually frivolous. As a result, he contends that the trial court erred in refusing to apply the no contest clause of Elizabeth's will. He challenges the trial court's finding of fact 1.61, that the will contest was necessary to determine the interpretation of the will.

Article VI of Elizabeth's will provided,

> In the event that any devisee, legatee or beneficiary under this will, or any one of my heirs shall begin or maintain any proceeding to challenge or deny any provision of this Will, any share or interest given to that person shall lapse and go into the residue of my estate and my Personal Representative is directed and required to refrain from making any distribution of any sums whatsoever to that person, if any, who shall seek to contest this will or any of its provisions.

No contest clauses are valid and enforceable in Washington. In re Estate of Mumby, 97 Wn. App. 385, 393, 982 P.2d 1219 (1999). However, these clauses do not operate where the contest is brought in good faith and with probable cause. Id. A will contestant will be deemed to have acted in good faith and with probable cause if the contest was initiated on the advice of counsel after fully and fairly disclosing the material facts. Id. A contestant acts in bad faith when he or she engages in actual or constructive fraud, or a neglect to fulfill a duty that is motivated by a sinister or interested reason, rather than an honest mistake. Id. at 394.

Jill contends that these defenses were raised in good faith, because she proceeded at all times according to the advice of attorneys. Elmer produced no evidence to the contrary. While it was factually clear that the time period for

---

[4] In support of this argument, Elmer correctly cites to RCW 11.24.010, which provides that a person seeking to challenge the validity of a will must petition the court within four months of the probate or rejection of the will.

11

bringing a will contest had long passed, whether such issues could be used defensively in a TEDRA action appears to be a matter of first impression.

We conclude that Jill did not act in bad faith in defending the TEDRA action. Accordingly, we hold that the trial court did not err in deciding not to apply the no contest clause to disinherit Jill.

## II.   Removal of Personal Representative

Elmer argues that the trial court erred by not removing Jill as personal representative of the estate. He contends that because the trial court specifically found that Jill is no longer a Washington resident, it should have removed her as personal representative. And, he asserts that Jill has breached her fiduciary duties to Elmer. Elmer assigns error to the trial court's findings of fact 1.15, finding that Jill's uncontroverted testimony was that she was acting upon the advice of the estate's attorney at all times, and 1.16, finding that there was no evidence that Jill breached her fiduciary duties.

RCW 11.68.070 gives the trial court discretion to remove the personal representative if he or she is subject to removal for any reason specified in RCW 11.28.250. A personal representative is subject to removal under RCW 11.28.250,

> [w]henever the court has reason to believe that any personal representative has wasted, embezzled, or mismanaged, or is about to waste, or embezzle the property of the estate committed to his or her charge, or has committed, or is about to commit a fraud upon the estate, or is incompetent to act, or is permanently removed from the state, or has wrongfully neglected the estate, or has neglected to perform any acts as such personal representative, or for any other cause or reason which to the court appears necessary.

While RCW 11.28.250 instructs the court to remove a personal representative who is permanently removed from the state, a person who is not an in-state resident may act as personal representative if he or she appoints an agent who is a resident of the county where the estate is being probated upon whom service of all papers may be made. RCW 11.36.010(6).

Jill lives in Chicago, Illinois. But, Jill appointed the estate's attorney to serve as resident agent upon whom service of papers may be made. Thus, she complied with RCW 11.36.010(6)'s condition under which a nonresident may act as personal representative. Because Jill complied with this condition, the trial court did not err in deciding not to remove her as personal representative when she resides out of state.

Elmer further argues that Jill breached her fiduciary duties, and the trial court erred in not dismissing her as personal representative. He asserts that by not investigating his community property claim, characterizing nonprobate assets as residue, failing to properly allocate and distribute the proceeds from the home sale, and attempting to force Elmer to waive his rights to the estate, Jill breached her fiduciary duties to him.

The trial court has broad discretion in determining whether and for what grounds to remove a personal representative. In re Estate of Aaberg, 25 Wn. App. 336, 339, 607 P.2d 1227 (1980). The question on appeal is whether the trial court's decision is so arbitrary as to amount to an abuse of discretion. Id. at 340. In this case, the trial court decided not to remove Jill as personal representative, because

it found that she was following the advice of the attorney for the estate in all of her actions as personal representative.

The evidence at trial supports the trial court's findings. Jill testified that the estate's former attorney developed the theory that Jill had a one-third ownership interest in the Federal Way house. She also testified that the attorney was responsible for an accounting that attributed to Elmer the attorney's fees for the estate's defense of the TEDRA action. Additionally, while the estate obtained new representation before trial, this attorney continued to support the line of reasoning advanced by the former attorney.

We conclude that the trial court did not abuse its discretion in deciding not to remove Jill as personal representative.

III.    Distribution of Funds

Elmer argues that the trial court erred in its order distributing funds from the Tvedt/Murphy trust. Elmer asserts that by first deducting the $19,789 that was owed to him from the court registry and then dividing the remainder of the funds equally amongst the four beneficiaries, the court effectively ordered him to pay for part of the overpayment out of his own inheritance.

Jill's response to this argument is simple: the trial court merely followed the advice of the accountant, and the accountant was right. The trial court adopted the accountant's advice. The CPA, Deaton, testified at the earlier evidentiary hearing to explain his accounting. He stated that if Elmer were compensated his 25 percent of the deficit capital payments owed by the other beneficiaries, he would be due an additional $19,000. Deaton opined that this would make Elmer whole

again, and going forward, the royalty payments from the Tvedt/Murphy trust would be divided equally amongst the four beneficiaries.

Before the trial began, the court granted Elmer's motion to have the oil and mineral deed proceeds deposited into the court registry. After trial, the court stated in its conclusions of law that the monies held in the court registry would be released to the Tvedt/Murphy estate trust upon a full accounting of the estate and the Tvedt/Murphy trust, and upon satisfaction of all outstanding debts and monies owed to Elmer.

Generally, a court that has custody over funds has the authority and duty to distribute funds to the party or parties who are entitled to the funds. Pac. Nw. Life Ins. Co. v. Turnbull, 51 Wn. App. 692, 699, 754 P.2d 1262 (1988). The court has broad discretion to avoid an unlawful or unjust result in distributing funds. Id.

Here, the other beneficiaries were required to pay back their overpayments to the estate. The estate then owed Elmer $19,789 to make him whole. This was not a personal obligation of Jill, Todd, and Kurt. It was the estate's responsibility to distribute the funds that were owed to Elmer. Deaton's accounting method treats the estate itself as an entity. Elmer has made no colorable argument explaining why the trial court abused its discretion by treating the estate as an entity. The distribution from the court registry effectuated the division of funds determined in the estate accounting.

Therefore, we affirm the trial court's disbursement of funds.

IV. Deed

Jill argues that the trial court erred in interpreting the deed to Elizabeth's Federal Way home to mean that Jill did not have an interest in the home.

Susan Mischel, Elizabeth's sister, conveyed the Federal Way home to Elizabeth and her parents, Philip and Mabel Murphy, by a special warranty deed in 1979. Then, on March 28, 1984, Elizabeth's parents quit claim deeded their interest in the property to "Elizabeth K. Kulesza or Jill R. Kulesza, mother and daughter." (Emphasis added.)

Jill's argument requires us to determine what interest is created by a deed "to A or B." We construe deeds to give effect to the parties' intent. Newport Yacht Basin Ass'n of Condo. Owners v. Supreme Nw., Inc., 168 Wn. App. 56, 64, 277 P.3d 18 (2012). Generally, this court determines the parties' intent from the language of the deed as a whole, giving meaning to every word if reasonably possible. Id. Where the language of a deed is ambiguous, extrinsic evidence may be considered to determine the parties' intent. Sunnyside Valley Irrig. Dist. v. Dickie, 149 Wn.2d 873, 880, 73 P.3d 369 (2003). Extrinsic evidence includes the circumstances of the transaction and the subsequent conduct of the parties. Newport Yacht, 168 Wn. App. at 65.

Here, the language of the deed is ambiguous. It is unclear what interest is created by the word "or." Jill asserts that the deed should be interpreted as transferring the property to Elizabeth and Jill as tenants in common. She argues that under RCW 64.28.020, any interest created in favor of two or more persons is an interest in common unless acquired by a partnership or declared to be a joint

16

tenancy. Because both Elizabeth's and Jill's names appear on the deed, Jill asserts that this must be construed as creating an interest in common. Alternatively, Jill argues that the deed could be interpreted as creating a joint tenancy with right of survivorship.

We disagree with both of Jill's proffered interpretations. A joint tenancy is created when the four unities exist: time, title, interest, and possession. In re Domestic P'ship of Reynolds, 183 Wn. App. 830, 854, 335 P.3d 984 (2014), review denied, 182 Wn.2d 1017, 345 P.3d 784 (2015). And, the defining characteristic of a tenancy in common is unity of possession. Falaschi v. Yowell, 24 Wn. App. 506, 509, 601 P.2d 989 (1979). Tenants in common have separate and distinct titles, and they each own a separate estate. Id. Both ownership forms at issue require unity of possession, meaning that each tenant has an equal right of possession. 17 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 1.28, at 57-58 (2d ed. 2004).

The ordinary meaning of the word "or" creates exclusive, alternate rights.[5] This is incompatible with both joint tenancy and tenancy in common. In order to

---

[5] In the context of statutory interpretation, Washington courts have interpreted the word "or" as disjunctive absent clear legislative intent to the contrary. See, e.g., HJS Dev., Inc. v. Pierce County ex rel. Dep't of Planning & Land Servs., 148 Wn.2d 451, 473 n.95, 61 P.3d 1141 (2003) ("Ordinarily, the word 'or' does not mean 'and' unless there is clear legislative intent to the contrary."); State v. Riofta, 134 Wn. App. 669, 682, 142 P.3d 193 (2006) ("We presume that the word 'or' does not mean 'and' and that a statute's use of the word 'or' is disjunctive to separate phrases unless there is a clear legislative intent to the contrary."), aff'd, 166 Wn.2d 358, 209 P.3d 467 (2009). When interpreting contracts, courts interpret the word "or" according to context, although "or" is most commonly used in the disjunctive to indicate an alternative. Black v. Nat'l Merit Ins. Co., 154 Wn. App. 674, 688, 226 P.3d 175 (2010).

find in favor of Jill, we would have to read the word "or" to mean "and." Neither party has cited any authority to support disregarding the ordinary meaning of "or" and interpreting it as creating inclusive rights in the context of a deed.

On this briefing and record, we reject the argument requiring us to substitute "and" for "or" in the deed. We hold that the trial court did not commit an error of law or an abuse of discretion by concluding that Jill did not have an interest in the Federal Way home.

V.     Community Lien

Jill argues that the trial court erred in imposing a community equitable lien against the Federal Way home. Therefore, she contends that the award of $52,143 to Elmer should be reversed.

Presumptions play a large role in Washington community property law. In re Estate of Borghi, 167 Wn.2d 480, 483-84, 219 P.3d 932 (2009). The character of property as separate or community property is determined when the property is acquired. Id. at 484. Once property is established as separate property, a presumption arises that it remains separate property. Id.

Washington law has long recognized that the community has a right to reimbursement for the funds expended in improvement of separate property. In re Estate of Trierweiler, 5 Wn. App. 17, 22, 486 P.2d 314 (1971). A lien may arise when community property or one spouse's separate property is used to improve the other spouse's separate property. Id.

Jill does not dispute the facts underlying the community lien claim. Elmer testified that the mortgage payments for the property were paid out of their joint account. Both he and Elizabeth deposited funds into this account. While Elizabeth was still alive, they refurbished the entire house. They installed a new kitchen, installed new windows and doors, put new fixtures in the bathroom, replaced the molding throughout the house, and painted. These renovations were also paid out of a joint account. Based on this evidence, the trial court found that the value of the mortgage payments and improvements to the property was $104,268[6]—a finding Jill does not dispute.

Instead, Jill relies on In re Marriage of Miracle, 101 Wn.2d 137, 675 P.2d 1229 (1984) to argue that any improvement Elmer contributed to the Federal Way property was offset by the benefit conferred to the community. Miracle was a dissolution case in which the trial court offset the community's beneficial use of one spouse's separate property against the amount of community funds used to make payments on the property. 101 Wn.2d at 137-38. On appeal, the court noted that the trial court's decision to impose an equitable lien is reviewed only for an abuse of discretion, given the equitable nature of dissolution proceedings. Id. at 139. The court held that the trial court did not abuse its discretion by refusing to impose an equitable lien, because the community was adequately compensated for its expenditures by its beneficial use of the property. Id. This was because the

---

[6] The trial court admitted multiple exhibits at trial that supported this finding, including invoices for the home improvements and checks for mortgage payments. However, these exhibits are not in the record on appeal.

reasonable rental value of the home exceeded the payments that the community had made on it. Id. at 138.

TEDRA is also a proceeding in equity, where the court must take into account all the circumstances. RCW 11.96.A.020(2). We review this decision for an abuse of discretion. Clearly, the trial court had the discretion to offset the community lien by the fair rental value of the property. However, Jill did not offer evidence of the fair rental value of the property during the time that the community lived in the home.[7] The trial court was not required to presume that the fair rental value of the home was greater than or equal to the mortgage payments. Without evidence on which to base an offset, the trial court would have had to speculate about the fair rental value of the home.

Based on the facts in evidence, we hold that it was not an abuse of discretion to impose the community lien without offset for community use.

VI.  Attorney Fees

Both Elmer and Jill argue that they are entitled to attorney fees. Elmer requests attorney fees at the trial level and on appeal, citing RAP 18.1, RCW 11.96A.150, and RCW 11.24.050. Jill also requests fees under RCW 11.96A.150.

RCW 11.96A.150 gives the trial court and the appellate court discretion to award costs, including attorney fees, in a TEDRA action. The court may order costs to be paid in such amount and manner as the court determines to be

---

[7] Jill points out on appeal that the community rented out the Federal Way home for a period of time. But, no evidence was presented that the rent they charged during this period was a proper measure of the fair rental value of the home during the time period that the community resided there.

equitable.  Id.  Weighing the equities here, we decline to award attorney fees to either party.

We affirm.

Appelwick, J

WE CONCUR:

Spearman, J.

Becker, J.