[No. 34235-9-II. Division Two. October 3, 2006.]

*In the Matter of the Estate of* MERLE L. KNOWLES.

VICKIE WALL, *Appellant*, v. RANDY KNOWLES, *Respondent*.

354

*Lance S. Stryker*, for appellant.
*Jeffrey J. Baker*, for respondent.

¶1 ARMSTRONG, J. — Vickie Wall appeals the denial of her petition to reject her father's will. Wall's brother, Randy Knowles, filled out the handwritten parts of the will and also received the bulk of the estate. The trial court rejected Wall's claims of undue influence, improper attestation, and unauthorized practice of law. Although the circumstances of the will's creation raise a presumption of undue influence, when viewed in light of the rebuttal evidence, they do not prove undue influence by clear, cogent, and convincing evidence. And substantial evidence supports the trial court's conclusion that the will was properly attested and that Randy Knowles was not practicing law when he filled out parts of the will. Accordingly, we affirm.

## FACTS

¶2 Randy Knowles handwrote the material provisions of Merle Knowles's will on a preprinted will form. The will appointed Randy as personal representative. To five of Merle's seven children, including Randy, it left certificates of deposit, which were already in their names. To Randy, the will also gave Merle's home, real property, and all residue. Randy estimated the value of the property he

received at $78,674.62. Each certificate of deposit was apparently worth $5,000.

¶3 More than three years after executing the will, Merle died and Randy submitted the will for probate. Two of Merle's daughters, Vickie Wall and Terry Lyons, contested the will on the grounds that it was not properly attested and that Randy had procured it through undue influence. The trial court found that the petitioners had met their initial burden of raising a presumption of undue influence, requiring Randy to come forward with rebuttal evidence.

¶4 Randy submitted a declaration explaining that he had completed the will form at his father's request. Another brother, Dusty Knowles, filed a declaration corroborating that their father had long intended for the bulk of the estate to go to Randy. These statements were excluded under the "deadman's statute," RCW 5.60.030.

¶5 Randy also submitted declarations of various friends and associates of Merle. These described Merle as a stubborn, strong-willed man who would not easily be influenced by anyone. They also stated that Merle had a closer relationship with Randy than with his other children. Finally, they reported that for the last 30 years of Merle's life, the contesting daughters had very little contact with their father and that the daughters' relationship with their father had been bitter and strained.

¶6 Leroy Goodrich and Carlene Camp attested the will, which Merle signed in Goodrich's office. Goodrich said that he and Merle had been best friends. In his declaration, Goodrich stated that he had seen Merle sign all three pages of the will. At his deposition, he again testified that he watched Merle sign the will but he did not remember how many times Merle had signed.

¶7 Camp was Goodrich's business manager and a licensed notary public. When she signed the will, she applied her notary stamp, which listed both Randy and Merle as signatories. In her declaration, she claimed that she had mistakenly included Randy's name as a witness. In deposi-

tion, she stated further that Randy had not even been present at the will signing. She expressed no confusion as to whether Merle had signed.

¶8 The trial court found that the petitioners had failed to prove the will's invalidity by clear, cogent, and convincing evidence. On motion to reconsider, the petitioners argued that Randy was barred from taking under the will because he had been practicing law when he drafted the will's terms. The trial court rejected the petitioners' challenge and awarded attorney fees to neither party. Wall appeals.

## ANALYSIS

¶9 We review a challenged finding of fact for substantial supporting evidence. Evidence is substantial if it is sufficient to persuade a rational, fair-minded person of the factual finding. *Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 176, 4 P.3d 123 (2000). If the standard is satisfied, we will not substitute our judgment for the trial court's. *Croton Chem. Corp. v. Birkenwald, Inc.*, 50 Wn.2d 684, 685, 314 P.2d 622 (1957). We review the trial court's legal conclusions de novo. *Sunnyside Valley Irrigation Dist. v. Dickie*, 149 Wn.2d 873, 880, 73 P.3d 369 (2003). The trial court resolves credibility issues—decisions that we may not review. *State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004) (citing *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990)).

¶10 Once a will has been probated, a contesting party bears the burden of proving its invalidity by clear, cogent, and convincing evidence. *In re Estate of Reilly*, 78 Wn.2d 623, 649, 479 P.2d 1 (1970) (quoting *In re Estate of Bottger*, 14 Wn.2d 676, 685-86, 129 P.2d 518 (1942)). Wall has challenged the will on three grounds: (1) that it was procured through undue influence, (2) that it was not properly attested and executed, and (3) that the bequest to Randy is invalid because Randy was practicing law without a license when he drafted the will.

I. UNDUE INFLUENCE

■ ¶11 A will is the product of undue influence when a party interferes with the testator's free will, preventing the testator from exercising his own judgment and choice. *In re Estate of Smith*, 68 Wn.2d 145, 153, 411 P.2d 879 (1966). Certain circumstances may raise a suspicion, varying in its strength, of undue influence. The most important of these are: (1) a fiduciary or confidential relationship between the testator and the beneficiary, (2) active participation by the beneficiary in preparing or procuring the will, and (3) the beneficiary's receipt of an unusually or unnaturally large part of the estate. Other appropriate considerations include " 'the age or condition of health and mental vigor of the testator, the nature or degree of relationship between the testator and the beneficiary, the opportunity for exerting undue influence, and the naturalness or unnaturalness of the will.' " *Reilly*, 78 Wn.2d at 647 (quoting *In re Estate of Schafer*, 8 Wn.2d 517, 521, 113 P.2d 41 (1941)). The presence of these elements will not automatically invalidate a will. Rather, they "appeal to the vigilance of the court and cause it to proceed with caution and carefully to scrutinize the evidence offered to establish the will." *Dean v. Jordan*, 194 Wash. 661, 672, 79 P.2d 331 (1938). The combination of facts may be so suspicious as to raise a presumption of undue influence and, "in the absence of rebuttal evidence, may even be sufficient to overthrow the will." *Dean*, 194 Wash. at 672 (citing *In re Estate of Beck*, 79 Wash. 331, 334-35, 140 P. 340 (1914)). But the existence of the presumption does not relieve the will challengers of proving undue influence by clear, cogent, and convincing evidence. *Reilly*, 78 Wn.2d at 663.

¶12 Here, Wall successfully raised a presumption of undue influence. Randy conceded a fiduciary relationship with Merle, he actively participated in the preparation of the will by drafting the handwritten portions, and he received the bulk of the estate to the near exclusion of the testator's remaining offspring. Thus, the trial court prop-

erly called on Randy to produce evidence rebutting that suspicion. Our review of Randy's rebuttal evidence demonstrates that substantial evidence supported the trial court's findings.

¶13 First, there was substantial evidence that Merle voluntarily signed the will. Camp and Goodrich testified that Merle signed the will in their presence. Camp also testified that Merle discussed the will's provisions with them at the time of signing. And although Wall argues that these two witnesses are not credible because of their confused deposition testimony, the trial court resolved these credibility issues against Wall, a decision we may not tamper with.

¶14 Second, there was substantial evidence that Merle was not a vulnerable testator. In cases where suspicion of undue influence existed but the contestant failed to carry the burden of proof, the Supreme Court has often noted the testator's strength of mind. *See, e.g., Reilly*, 78 Wn.2d at 625; *Smith*, 68 Wn.2d at 151; *In re Estate of Malloy*, 57 Wn.2d 565, 570, 358 P.2d 801 (1961); *In re Estate of Martinson*, 29 Wn.2d 912, 919, 190 P.2d 96 (1948). In contrast, courts have voided wills for undue influence where the testators demonstrated "little or no mental capacity." *Smith*, 68 Wn.2d at 154 (citing *In re Estate of Ganjian*, 55 Wn.2d 360, 347 P.2d 891 (1959); *In re Estate of Jaaska*, 27 Wn.2d 433, 178 P.2d 321 (1947); *In re Estate of Tresidder*, 70 Wash. 15, 125 P. 1034 (1912)); *see also In re Estate of Bush*, 195 Wash. 416, 422-23, 81 P.2d 271 (1938). In *Bush*, for example, the decedent was practically blind and helpless, and while his mind was probably as strong as that of an average 90-year-old, he was peculiarly susceptible to his daughter's influence. *Bush*, 195 Wash. at 422-23.

¶15 Here, Merle's friends and associates described him as a particularly strong-willed man of sound mind. Christopher Lanz, an attorney who had represented Merle in a number of matters in the latter years of Merle's life, described him as "a strong-willed individual who would not be led to do certain acts, such as write a will or make a

codicil to a will, without understanding the gravity of such acts." Clerk's Papers (CP) at 85. Darlene Goodrich, a personal friend of Merle, said he "was never shy on how he felt and would let you know his opinion even if it wasn't something you wanted to hear." CP at 134. Another friend, James Richardson, described Merle as "opinionated and strong-willed." CP at 136. Doug McCuistion visited Merle twice a week for the last 10 years of Merle's life and said Merle "was a strong-willed person who knew what he was doing, and did exactly as he pleased, to the very end." CP at 142.

¶16 Third, there is substantial evidence that Merle's will dispositions, despite the unequal distribution among his offspring, were a natural result of his relationships with his children. A disparately large gift to one beneficiary does not necessarily denote undue influence if there is a natural explanation for it. The *Reilly* court, for instance, reversed a finding of undue influence, finding nothing unnatural about a testatrix leaving her estate to a charitable home where she had resided and been cared for rather than to cousins from whom she had not heard for 28 years. *Reilly*, 78 Wn.2d at 634-37.

¶17 This principle applies even where a fiduciary participates in drafting the will and receives an apparently unnaturally large gift. In *Martinson*, the testator and the sole beneficiary under his will lived together as husband and wife after the deaths of their respective spouses. *Martinson*, 29 Wn.2d at 915. The attorney who drafted the will had been called to their home by the beneficiary, who was actively involved in the will's drafting and signing. *Martinson*, 29 Wn.2d at 915-16. The will left the entire estate to this beneficiary, to the complete exclusion of the testator's nine siblings. *Martinson*, 29 Wn.2d at 913. The Supreme Court held that there was no undue influence by the beneficiary where it was apparent the testator "made his will with the deliberate intent of remembering the woman he loved and hoped to make his wife." *Martinson*, 29 Wn.2d at 921. In contrast, the cases holding undue influ-

ence have generally involved the exclusion of one near and dear to the testator and the majority of the estate going "to one with whom the testator had no close ties." *Smith*, 68 Wn.2d at 154; *see also Bush*, 195 Wash. at 418 (upholding a finding of undue influence where the testator "had the usual paternal affection for all of his children" but left the entire estate to one daughter while leaving one dollar to each of his other five daughters).

¶18 Here, the evidence showed that Merle enjoyed a close relationship with Randy, while he had little contact with his daughters. According to Goodrich, Merle claimed not to have a relationship with his daughters and said on numerous occasions that he wanted most of his estate to go to Randy. Camp corroborated this. Carol Harris, Merle's banker, reported that Merle often added Randy "as co-owner or as sole beneficiary" on various financial transactions, while Harris was "unaware that he had any other children, as he had never spoken of them, nor had he included them as co-owner's [sic] or sole beneficiaries on his accounts." CP at 83. Darlene Goodrich wrote, "[W]hen Merle got the place from Randy he said the property would go back to Randy if he died." CP at 134. Richardson stated that he never saw Merle's daughters around and that Merle rarely mentioned his daughters; but he described Randy as "the apple of Merle's eye." CP at 137. McCuistion said Merle had no relationship with his daughters and had basically no contact with them. Meanwhile, he said that of all Merle's children, Merle was closest to Randy. Robert Connolly, who had known Merle for 40 years, stated he was aware of no contact between Merle and his daughters in the last 30 years, while Merle had a particularly close relationship with Randy.

¶19 Wall offered no evidence to refute this testimony. The evidence shows that Merle signed the will, that he was not likely to sign it unless it was what he wanted, and that the terms are consistent with his family relationships and his wishes. While the circumstances of the will's creation raise rational suspicions, they do not alone prove by clear, cogent, and convincing evidence that Randy interfered with

his father's free will and prevented his exercise of judgment and choice. Randy's uncontested rebuttal evidence supports the trial court's finding that the will was not the product of undue influence.

## II. ATTESTATION

¶20 Wall argues that the will is invalid for failure to comply with the testamentary formality requiring attestation by two competent witnesses. The witnesses were Goodrich and Camp. Wall claims that their attestation was invalid because Camp's attestation involved a false notarization and because Goodrich was not competent.

¶21 A will must "be attested by two or more competent witnesses, by subscribing their names to the will . . . while in the presence of the testator and at the testator's direction or request." RCW 11.12.020(1). Persons are competent to witness a will signing if *"at the time they attested,* [they] could legally testify in court to the facts which they attest by subscribing their names to the will." *In re Estate of Mitchell,* 41 Wn.2d 326, 341, 249 P.2d 385 (1952) (emphasis added) (citing *In re Estate of Charles,* 118 Neb. 634, 225 N.W. 869 (1929)). Such persons are "not legally disqualified by reason of mental incapacity, personal interest or conviction of crime, from testifying in courts of justice." *Mitchell,* 41 Wn.2d at 341 (citing *Hiatt v. McColley,* 171 Ind. 91, 85 N.E. 772 (1908)). A person who appears "incapable of receiving just impressions of the facts" or "of relating them truly" is incompetent to testify. RCW 5.60-.050(2).

¶22 Wall asks us to disregard Camp's attestation because she violated her duties as a notary public by falsely stating that Randy signed the will. But the statute does not require that a will be attested through proper notarization. A notary may be an attesting witness where the requirements of a valid attestation are met. *In re Estate of Black,* 153 Wn.2d 152, 167-68, 102 P.3d 796 (2004). The pivotal question is whether the notary is attesting to the genuine-

ness of the signature or to the formalities of proper will execution. *Black*, 153 Wn.2d at 168 (citing *In re Estate of Alfaro*, 301 Ill. App. 3d 500, 703 N.E.2d 620, 234 Ill. Dec. 759 (1998)). The requirements of valid attestation are met where the notary interacted with the testator, could judge his competency, declared that the testator signed the will in her presence, was qualified as a witness, and was asked by the testator to sign the will. *Black*, 153 Wn.2d at 168. This is exactly what happened here. Merle went to Goodrich's office to have Goodrich and Camp sign his will, and the three interacted, joking about the burden on Randy of having to dispose of Merle's junk. And Camp's notary stamp states that Merle signed the will in her presence.

¶23 That Camp failed to comply with her professional responsibilities does not disqualify her from attesting a will. *See Reilly*, 78 Wn.2d at 655-56. In *Reilly*, one of the witnesses to the will was the attorney who drafted it. The trial court disregarded his testimony as to the testatrix's mental condition because his conduct in producing the will fell far below the minimal standards of a practicing lawyer. *Reilly*, 78 Wn.2d at 655. The Supreme Court agreed that the attorney had done a careless job, but it held that the attorney's poor draftsmanship did not render him incompetent as an attesting witness. "He was in a position to observe the testatrix'[s] demeanor and her statements regarding the will. He was also in a position to form an opinion as to her testamentary capacity and her mental alertness." *Reilly*, 78 Wn.2d at 656. The Supreme Court thus held that the trial court had erred in refusing to consider the attorney's testimony. *Reilly*, 78 Wn.2d at 656. Likewise, Camp erred in dispensing with her responsibilities as a notary. But that did not render her incapable of observing Merle's demeanor, statements, and mental capacity as he signed the will.

¶24 Still, Wall argues that Goodrich was incompetent because his deposition testimony was inconsistent with his declaration. Wall points out that in his deposition, Goodrich denied having received or signed a document from Randy's

attorney or having spoken with Randy's attorney 12 days after signing a declaration that he had discussed with Randy's attorney by phone. Further, Goodrich claimed in that declaration to have watched Merle sign all three pages of the will, but at his deposition, he stated that he did not see how many times Merle signed it.

¶25 These inconsistencies show at most that Goodrich, four years after the signing, was confused about the details of the will's execution and may have a faulty memory. They do not prove as a matter of law that at the time he witnessed Merle execute the will, Goodrich was incapable of testifying as to Merle's mental competency or that he signed the will. In *Reilly*, the Supreme Court noted that the second witness "did not recall all the details concerning which she was cross-examined," yet the court disagreed with the trial court's refusal to consider her testimony. *Reilly*, 78 Wn.2d at 657.

¶26 Likewise, it would have been error here for the trial court to find Goodrich was not a competent attesting witness. Wall provided no evidence as to Goodrich's mental faculties at the time of execution. And despite the inconsistent statements, there was no evidence to contradict Goodrich's statement that he watched Merle sign the will. To the extent Wall argues that the inconsistent testimonies show Goodrich and Camp are lying and that Merle never signed the will, this was a credibility determination for the trial court. Wall has not proven improper attestation.

### III. UNAUTHORIZED PRACTICE OF LAW

¶27 Alternatively, Wall asks the court to invalidate the bequest to Randy on the ground that he, as the scrivener of the will, was not entitled to draft a substantial gift to himself. The argument derives from *In re Estate of Marks*, 91 Wn. App. 325, 957 P.2d 235 (1998). In *Marks*, Blanford, a close personal friend of Marks, selected a will kit for Marks, discussed with her the distribution of assets and whether it was fair, obtained an inventory of investments,

typed the will, and arranged for its signing and witnessing. *Marks*, 91 Wn. App. at 335. The will's provisions included gifts of diamonds to Blanford and $100,000 to Blanford's religious organization. *Marks*, 91 Wn. App. at 332. When the will was submitted to probate, the heirs contested it, arguing undue influence and that Blanford had engaged in the unauthorized practice of law by drafting the will. *Marks*, 91 Wn. App. at 332-33. The trial court found no undue influence, but it found that Blanford had engaged in the unauthorized practice of law, thereby voiding the gifts to Blanford and her organization. *Marks*, 91 Wn. App. at 333. The contestant appealed the trial court's decision to void only these specific gifts rather than the entire will.[1] *Marks*, 91 Wn. App. at 333. In affirming the trial court, Division Three explained that the "selection and completion of preprinted form legal documents" is the practice of law; therefore RPC 1.8(c) applied to Blanford's role in preparing Marks's will. *Marks*, 91 Wn. App. at 335. Because, under this rule, a lawyer would not be permitted to draft a substantial gift to herself, Blanford was not permitted to do so while acting as a lawyer. *Marks*, 91 Wn. App. at 335-36.

 ██ ¶28 The trial court here distinguished *Marks* on the ground that Randy's act of simply adding Merle's provisions to a preprinted form did not rise to "the degree of overweening control that was evinced by the defendants in *Marks*." Report of Proceedings at 83. We agree. In *Marks*, Blanford selected the will form, discussed the distribution of assets with the testatrix and whether it was fair, typed the will, and arranged the signing and witnessing. Wall presented no evidence that Randy did any more than fill in the will form as Merle wanted. This falls short of practicing law.

¶29 We disagree with *Marks* to the extent it holds that merely completing a preprinted will form is the practice of

---

[1] The issue before the court was phrased as: "If a will is the product of the unauthorized practice of law, is the entire will rendered invalid?" *Marks*, 91 Wn. App. at 335. The findings that Blanford was engaged in the practice of law and that her specific gifts should be voided were not appealed. Thus, the court's language approving this aspect of the trial court's decision was dicta.

law. For this proposition, *Marks* cites *Hagan & Van Camp, P.S. v. Kassler Escrow, Inc.*, 96 Wn.2d 443, 635 P.2d 730 (1981). There, the practicing party was an escrow agency that "closed several real estate transactions and in the process prepared documents and performed other services." *Hagan & Van Camp*, 96 Wn.2d at 445. For its holding, *Hagan & Van Camp* cited *Washington State Bar Ass'n v. Great Western Union Federal Savings & Loan Ass'n*, 91 Wn.2d 48, 55, 586 P.2d 870 (1978), which involved a lender who selected and completed the legal documents it deemed necessary and appropriate to close both the loan and the underlying sale. *Great W. Union*, 91 Wn.2d at 50. That case, in turn, relied on a series of cases, all involving parties engaged in similar levels of legal activity. *See, e.g.*, *In re Disciplinary Proceedings Against Droker & Mulholland*, 59 Wn.2d 707, 708-09, 370 P.2d 242 (1962) (escrow agents); *Wash. State Bar Ass'n v. Wash. Ass'n of Realtors*, 41 Wn.2d 697, 698, 251 P.2d 619 (1952) (real estate broker who prepared deeds pertaining to transactions negotiated through his office); *In re Unauthorized Practice of Law by McCallum*, 186 Wash. 312, 313, 57 P.2d 1259 (1936) (real estate and insurance agent); *Paul v. Stanley*, 168 Wash. 371, 372, 12 P.2d 401 (1932), *overruled on other grounds by Wash. State Bar Ass'n*, 41 Wn.2d at 700 (notary public and real estate broker who advised on and drafted community property agreements, deeds, and claims of lien). In *Paul*, the Supreme Court stated that one "who *gives legal advice* to those for whom he draws instruments, or holds himself out as competent to do so, does work of a legal nature, when the instruments he prepares either define, set forth, limit, terminate, specify, claim or grant legal rights." *Paul*, 168 Wash. at 376-77 (emphasis added).

¶30 In short, *Marks* relied on cases where parties exerted a much greater degree of control than Randy exercised here. Generally, a person begins to practice law by either directly or indirectly (selection of appropriate documents) giving advice. Here, Wall presented no evidence that Randy selected the will form or advised Merle about his

dispositions. The trial court did not err in concluding that Randy did not practice law in filling out the will form.

IV. ATTORNEY FEES

¶31 Finally, Wall claims the trial court erred in refusing to award her attorney fees. Because Wall's will challenge fails, the trial court properly refused to award her attorney fees.

¶32 Affirmed.

QUINN-BRINTNALL and PENOYAR, JJ., concur.