# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Estate of: | No. 55461-5-II |
| MARK LESTER BESOLA, | |
| Deceased. | |
| AMELIA BESOLA, individually, | |
| Plaintiff,, | |
| v. | |
| ERIC PULA, individually and as Personal Representative of the Estate of Mark L. Besola; KELLY MCGRAW, individually; JULIA BESOLA-ROBINGSON, individually, UC DAVIS VERTERINARY CATASTROPHIC NEED FUND; KARE KITSAP ANIMAL RESCUE AND EDUCATION; BRANDON GUNWALL, individually, | UNPUBLISHED OPINION |
| Defendants. | |
| AMELIA BESOLA, | |
| Appellant, | |
| v. | |
| BRANDON GUNWALL, | |
| Respondent, | |

No. 55461-5-II

JOHN DOES 1-20, FIDELITY BROKERAGE
SERVICES, LLC,

                       Defendants.

       CRUSER, J. – On April 4, 2018, the primary beneficiary designations on Mark Besola's

Fidelity investment accounts were changed electronically from Mark's former boyfriend Jeffrey

Swenson to Brandon Gunwall, a man whom Mark[1] had only known for a very short period of time.

Mark died on January 1, 2019. Mark's sister Amelia Besola, who purchased Swenson's right to

sue as a prior beneficiary, filed a petition seeking to overturn the April 4 Fidelity beneficiary

designations.[2] The superior court granted Gunwall's motion for summary judgment and dismissed

Amelia's purchased claims against Gunwall.

       Amelia appeals the superior court order granting Gunwall's motion for summary judgment.

She argues that the superior court erred when it concluded that there were no questions of fact as

to (1) whether Gunwall exercised undue influence over Mark when Mark changed the designated

primary beneficiary of the Fidelity accounts from Swenson to Gunwall, thus invalidating the

beneficiary changes under contract principles, and (2) whether Mark was a vulnerable person

---

[1] We refer to Mark, Amelia Besola, and their sister Julia Besola-Robinson, by their first names for clarity.

[2] Beneficiary designations are part of the investment account contracts. *See* 26B CHERYL C. MITCHELL & FERD H. MITCHELL, WASHINGTON PRACTICE: PROBATE LAW AND PRACTICE § 1:9 (2d ed. 2015). The parties do not dispute that Swenson, as the prior primary beneficiary to these contractual accounts, had standing to challenge the beneficiary changes or that Amelia, as the purchaser of Swenson's rights, has standing to challenge the April 4 beneficiary designations.

under the slayer/abuser statute, RCW 11.84.020.[3] She also argues that certain evidence should not be considered under the dead man's statute, RCW 5.60.030. We affirm the superior court's order granting Gunwall's summary judgment motion and deny Gunwall's request for attorney fees and costs.

FACTS

I. BACKGROUND FACTS[4]

A. MARK'S RELATIONSHIPS WITH HIS SISTERS

Throughout their lives, Mark had contentious relationships with his sisters Amelia and Julia. Following their mother's death, all three siblings were partners in a family business, Besola Realty Enterprises. Mark and Amelia, who were both veterinarians, also worked together in a veterinary practice from 2000 to 2015. The ownership of the veterinary practice was later highly disputed.

By 2018, the family relationships had become so strained that the siblings were exploring ways to break up the family business. Mark was also claiming a partnership interest in the veterinary practice that he asserted Amelia had unilaterally terminated, and he was in the process of filing a lawsuit against Amelia.

Mark met with attorney Thomas Gates in March 2018 regarding the lawsuit against Amelia. Gates later filed a declaration stating that when they met, he believed that Mark had the

---

[3] Amelia also presents argument addressing orders related to a will contest. Because only the orders related to Gunwall's motion for summary judgment are properly before us, we do not address any arguments related to the will contest.

[4] Because we are addressing a summary judgment motion, unless otherwise noted, these facts are taken in the light most favorable to the nonmoving party, Amelia. *Sartin v. Estate of McPike*, 15 Wn. App. 2d 163, 172, 475 P.3d 522 (2020), *review denied*, 196 Wn.2d 1046 (2021).

capacity to file the lawsuit and that no one else was present when they met. On August 31 and December 12, Mark also met with attorney Gregory Lucas to draft the complaint against Amelia. No one accompanied Mark to these meetings. Lucas later filed a declaration stating that it was his belief that Mark had the capacity to verify the complaint and that he was competent when he signed the verification.

Although the siblings' relationships had always been contentious, the disputes became more difficult in 2018. During 2018, Mark threatened to disinherit his sisters. According to Amelia, Mark had made such threats numerous times before, perhaps 20 to 30 times since 1984, but Amelia asserted that he had never followed through on this threat. Julia believed that Mark was making such threats to increase his leverage in the dissolution of the family business.

Starting in March, Mark engaged in a series of highly vitriolic email, text, and telephone exchanges with Amelia. Mark's statements became concerning enough to Amelia that she obtained a protection order in August.

By September, the sisters sought to engage in a mediation to divide the family business properties. Although Amelia was skeptical that Mark would attend the mediation, a mediation was scheduled for January 2019. Amelia, who believed that Mark had substance abuse issues, later stated that she had hoped the mediation would operate, in part, as some type of intervention with Mark by removing him from his current environment. But Amelia did not recall if she communicated this to the mediator or told the mediator that Mark lacked the capacity to participate in the mediation to divide their shared assets.

4

Although primarily restricted to a wheelchair due to "[i]mpaired mobility," possibly due to vascular and edema issues in his legs,[5] Mark came to Julia's house for a family gathering to celebrate Julia's daughter's birthday in March 2018; and he attended a Mother's Day event at Amelia's house in May 2018. Clerk's Papers (CP) at 69. He drove himself to these events. According to Julia, at the March gathering, they talked about Mark's health issues, and he said he was fatigued and his legs hurt. Neither Amelia nor Julia came to Mark's Lake Tapps residence in 2018.

B. MARK'S PERSONAL RELATIONSHIPS AND THE APRIL 4, 2018 BENEFICIARY CHANGE

2018 was also a tumultuous year for Mark personally. In addition to his issues with his sisters, Mark experienced several serious incidents at his home and with some of the individuals who were living with him.

In 2018 Mark lived in his Lake Tapps residence with several unrelated individuals, including Jimi Hansen, Mark's former boyfriend Swenson, Bradley Bouton, Eric Pula, and James Garrett. Others, including Kelly McGraw, rented two apartments located on the premises.

Mark met Gunwall in early 2018. Mark quickly invited Gunwall to move in and to assist him with caring for the residence, the yard, and Mark's several dogs. Gunwall did not pay rent. When Gunwall moved in, Swenson, Hansen, and others were living in the residence.

According to Gunwall, "[s]hortly after [he] moved in" Mark "had a falling out" with Swenson, and Swenson refused to leave when Mark asked him to. *Id.* at 1256. Gunwall "stood up for Mark and was able to get [Swenson] to leave the house." *Id.* Gunwall stated that Swenson had

---

[5] Mark's hospital records from 2016 noted that although he used a wheelchair he was capable of self-transfer and that he would walk without assistance.

been "able to take advantage of Mark and his financial resources." *Id.* Gunwall also asserted that Mark had, at some point, also asked him to for help removing others from the residence because they had damaged the residence and had stolen from Mark.

On April 4, just months after Gunwall moved into Mark's home, the primary beneficiary designations on certain Fidelity investment accounts were changed from Swenson to Gunwall.[6] These beneficiary designation changes were made electronically.

Documentation that Fidelity later provided, which appears to cover electronic transactions in Mark's accounts from May 2017 to August 2018, showed that on April 4, 2018 someone had attempted to access Mark's Fidelity account four times.[7] Two attempts to access the account, one at 4:15:15 and the other at 8:11:40, appear to have been successful. Two of the attempts, one at 19:16:44 and the other at 23:33:40, failed. Both of the failed attempts appear to have been from a Samsung Android phone. The successful attempts appear to have been made from a different device. This record also showed frequent failed attempts to access the accounts over the entire period of the report, many of which predated Mark's acquaintance with Gunwall.

On June 11, Hansen forced Mark, Gunwall, and Bouton into Mark's car; drove Mark around; threatened Mark; and took Mark's phone away from him after Mark was discovered texting one of his sisters for help. When they returned to the Lake Tapps residence, Gunwall helped

---

[6] The secondary beneficiary designations to Amelia and Julia were not changed on April 4, 2018. Based on the record before us, it appears that as of September 30, 2019, these accounts were valued at $629,880.17. Although Amelia asserts in her opening brief that the non-probate assets that would go to Gunwall amount to $1.4 million, she does not cite to anything in the record establishing this amount, and she appears to be referring to both the Fidelity accounts and the life insurance benefits, which are not at issue in this appeal.

[7] These accounts appear to be both brokerage accounts and retirement accounts.

Mark into his wheelchair and back into the house. Once inside the house, Hansen "head-butted" Mark. *Id.* at 1478. Gunwall stated in later deposition testimony that after this event Mark seemed scared, and at some point he told Gunwall that he needed to get Hansen out of the house, and Hansen moved out. Sometime before December, Bouton also moved out of the residence.

At some point in June, after Hansen had moved out, Mark met Eric Pula, and Pula began living at Mark's residence. In lieu of rent, Pula provided "security" for Mark and occasionally drove Mark places and provided other assistance. *Id.* 434. At Mark's request, Pula and Gunwall evicted some individuals from the residence.

In October, Mark fell into the lake and was unable to get out. Gunwall, Bouton, and a guest pulled Mark out of the lake. On October 15, the beneficiary designations for Mark's life insurance policy were changed from Swenson to Gunwall.[8]

On December 1, Mark's former housemate Bouton and his brother broke into Mark's house and struck Mark with a baseball bat. When Bouton and his brother then approached Pula, Pula shot them, killing Bouton's brother. Bouton later pled guilty to residential burglary, second degree robbery, and third degree assault.

When the police investigated the December 1 shooting, they found the residence in total "disarray." *Id.* at 900. They noted that there was drug paraphernalia and dog feces throughout the residence and that there was a five-gallon bucket that was "3/4 full of an unknown liquid-type substance" with a strong odor near the couch where Mark primarily stayed. *Id.* Some of the people who lived in the Lake Tapps residence verified that Mark lived mainly on the couch and that he

---

[8] The life insurance is not at issue in this appeal.

would use various containers to relieve himself when he was unwilling or unable to get to the bathroom.

At some point after the December 1 incident, Mark asked Gunwall, Pula, and McGraw to marry him in order for them to inherit his property. They all declined.

C. MARK'S HEALTH ISSUES AND DEATH

Mark suffered from several chronic health issues and made regular visits to the doctor and hospital, sometimes with the assistance of those living in the Lake Tapps residence. Mark was hospitalized in February 2018 with vascular issues and cellulitis and on May 17 with renal failure, anemia, chronic heart failure, and an ulceration on his leg. But the medical records before us do not show any indication that Mark was experiencing any cognitive or mental health issues around the time of the April 4 beneficiary change.

On December 30, Gunwall drove Mark to the hospital because Mark had been "dry heaving and he wasn't . . . feeling good." *Id.* at 1505. Although Mark initially improved, he died on January 1, 2019, at the age of 52. His cause of death was listed as "hepatic encephalopathy" and "chronic ethanolism with steatosis." *Id.* at 279 (capitalization omitted). The hospital records showed that Mark had methamphetamine in his system when he arrived at the hospital.

Mark's prior medical records from a March 12, 2016 admission noted that Mark had a history of narcotic/opioid use and had overdosed "in the past and refused offers for detox." *Id.* at 67. Although this same record also notes that Mark "went to and finished rehab" in 2007, it also noted a narcotic overdose in 2013. *Id.* at 68. No other hospital records mention narcotic or opioid abuse.

8

During the 2016 admission, Mark presented as confused and had suffered "multiple falls over [the] past few days." *Id.* at 79. This record also states that Mark had a history of deep venous thrombosis and superficial thrombophlebitis in 2013. Other records show that Mark had a history of "diastolic heart failure, obstructive sleep apnea, and extensive aortocaval DVT with chronic lower extremity edema."[9] *Id.* at 89.

## II. PROBATE, DISCOVERY OF WILL, AND LITIGATION

Days after Mark's death, Amelia opened an intestate probate for Mark's estate and was appointed as the administrator. A short time later she contacted Fidelity and requested that Fidelity withhold payment to the beneficiary of Mark's accounts to allow her time to investigate the circumstances of Mark's death and whether the estate or Amelia could bring an action under the slayer/abuser statute.

Amelia also obtained a court order granting her access to the Lake Tapps property to remove the dogs. While at the property on February 2, Amelia and the people helping her found it littered with hypodermic needles and meth pipes and full of debris and dog feces.

On May 8, Pula filed a will that Mark purportedly drafted on December 6, 2018 (the Pula will). The Pula will expressly disinherited Amelia and Swenson; excluded Amelia as the personal representative; and left substantial assets to Pula, McGraw, Julia, and two animal-related charities. The Pula will also left Mark's dogs to Gunwall on the condition that he care for the dogs, and it provided that if Gunwall took the dogs he would also be the beneficiary of Mark's life insurance policies. This will did not mention the Fidelity accounts. Amelia was removed as personal

---

[9] Other records characterized this as lymphedema.

representative, and Pula was appointed in her place.[10] Amelia filed a petition contesting the Pula will.

In October 2019, Amelia filed a petition seeking to overturn the beneficiary designations that changed the primary beneficiary from Swenson to Gunwall on Mark's Fidelity investment accounts. Although the October 2019 petition is not in our record, it appears that Amelia argued that Gunwall could not be the beneficiary of the Fidelity investment accounts because (1) he exercised undue influence over Mark in obtaining the beneficiary designations, which invalidated the designations under contract principles, and (2) he was precluded from benefiting from the Fidelity accounts under the slayer/abuser statute, RCW 11.84.020, because Mark was a vulnerable person.

On October 9, 2020, Gunwall moved to dismiss Amelia's petition seeking to invalidate the beneficiary designations on Mark's Fidelity investment accounts and for an order directing Fidelity to release the funds for which he was the designated primary beneficiary. Gunwall asserted that because he was not claiming anything under the will, the only claims against him related to the beneficiary designations on the Fidelity accounts and were based on alleged financial exploitation of a vulnerable adult under chapter 11.84 RCW and alleged undue influence. He argued that there was no admissible evidence establishing by clear, cogent, and convincing evidence that Mark was a vulnerable adult or that he (Gunwall) exercised undue influence over Mark when Mark changed his beneficiary designations from Swenson to Gunwall on the Fidelity accounts.

---

[10] It appears that Pula was removed as the personal representative in December 2020, and that Amelia was again appointed as the personal representative of Mark's estate.

That same day, Pula moved to dismiss Amelia's will challenge, and Amelia filed a motion for summary judgment regarding her motion to invalidate the Pula will. Amelia later filed a motion to continue the summary judgment motions.

On November 6, the superior court heard all three October 9, 2020 motions and Amelia's motion to continue the summary judgment motions. The superior court granted Amelia's motion to continue Pula's motion to dismiss Amelia's will challenge and Amelia's motion for summary judgment, but it denied the motion to continue Gunwall's summary judgment motion.

After hearing argument on Gunwall's summary judgment motion and considering 39 documents submitted with his motion for summary judgment and the responsive pleadings, the superior court granted the summary judgment motion and dismissed the claims against Gunwall with prejudice. The superior court ordered Fidelity to transfer the funds to the court registry. The superior court subsequently denied Amelia's motion for reconsideration.

The superior court later directed the entry of a final judgment as to these claims pursuant to CR 54(b). Our commissioner subsequently ruled that this appeal was limited to the review of the order granting Gunwall's summary judgment motion.

## ANALYSIS

Amelia appeals from the order granting Gunwall's summary judgment motion.[11] She argues that the superior court erred when it concluded that there were no questions of fact as to (1) whether Gunwall exercised undue influence over Mark when Mark replaced Swenson with Gunwall as the primary beneficiary to the Fidelity accounts, thus invalidating the beneficiary changes under contract principles, and (2) whether Mark was a vulnerable person under the slayer/abuser statute, RCW 11.84.020. She also argues that certain evidence should not be considered under the dead man's statute, RCW 5.60.030.

### I. DEAD MAN'S STATUTE

Because it potentially affects what evidence we may consider, we first address Amelia's evidentiary argument. Amelia argues that the superior court erred in relying on statements of parties of interest, Pula, McGraw, and Gunwall about statements made by Mark. She contends that those statements should have been excluded under the dead man's statute, RCW 5.60.030. Without attributing any statement to any specific person, Amelia challenges the following statements by Pula, McGraw, and Gunwall: "Mark wanted to marry me or asked me to marry him; Mark told me I was his best friend; Mark wanted me to take care of his dogs if he died; Mark's family could not

---

[11] Amelia also assigns error to the superior court's denial of her motion for reconsideration of the summary judgment order. But Amelia does not present any argument related to that assignment of error, so we do not address it. RAP 10.3(a)(6); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

Amelia also argues that the superior court erred in granting Pula's motion for summary judgment dismissing all claims and denying Amelia's motion for summary judgment. These arguments are outside of the scope of this appeal, so we do not address them.

We note that Amelia has also attached more than 200 pages of attachments to her opening brief, many of which are not part of the appellate record. All documents attached to a party's brief must be a part of this court's record. RAP 10.3(a)(8). Thus, we have not considered any document that is not part of the official appellate record.

accept him as gay; and Amy stole money and assets from Mark, including his veterinarian clinic." Br. of Appellant at 42.

The dead man's statute, RCW 5.60.030, bars evidence presented by a party in interest regarding "any transaction had by him or her with, or any statement made to him or her, or in his or her presence, by any such deceased." "A 'party in interest' under RCW 5.60.030 is one who 'stands to gain or lose in the action in question.' " *In re Estate of Lennon*, 108 Wn. App. 167, 174, 29 P.3d 1258 (2001) (quoting *Bentzen v. Demmons*, 68 Wn. App. 339, 344, 842 P.2d 1015 (1993)). "The [dead man's] statute may be waived when the protected party introduces evidence concerning a transaction with the deceased." *Id.* at 175.

Although Amelia argues that any evidence from Pula, McGraw, and Gunwall about statements Mark made to them are inadmissible under the dead man's statute, the only interested parties in relation to the Fidelity beneficiary designation are Gunwall and, due to her purchase of Swenson's interest, Amelia. Thus, any statements related to the Fidelity beneficiary designation made by Pula and McGraw are not excluded under the dead man's statute for purposes of Gunwall's motion for summary judgment.

Amelia states broadly that there was evidence from Gunwall that was inadmissible, but the only statements she identifies that were not testified to by other sources was Gunwall's statement that Mark wanted Gunwall to care for the dogs if Mark died and Gunwall's statement that Mark had asked him (Gunwall) to marry him in order to inherit his property and keep Amelia and Julia from inheriting. Thus, we limit our review of this issue to those particular statements.

Although Gunwall's statement that Mark wanted him to care for the dogs if Mark died could fall under the dead man's statute, the record also contains an email from Amelia to her

13

attorneys stating, "Mark left clues and repeatedly told everyone why he was leaving the investment income to [Gunwall]. Mark had six dogs and he had this fantasy that [Gunwall] would keep his dog family, consisting of those 6 dogs intact."[12] CP at 1353. Amelia characterized the plan to keep the dogs together as unreasonable and suggested that this evidence could be used as evidence that Mark was not of sound mind. Because Amelia herself presented evidence that Mark wanted Gunwall to care for the dogs if he died, she has waived any objection to this evidence under the dead man's statute.

As to Gunwall's testimony about Mark proposing that they marry to avoid Mark's sisters from inheriting, that statement likely falls under the dead man statute. But since Pula also provided evidence that Mark proposed marriage to Pula and to McGraw to ensure they inherited from him, demonstrating that Mark did not want his sisters to inherit, the omission of that specific statement has no impact on our summary judgment analysis.

---

[12] Amelia produced this email in response to a discovery request.

## II. SUMMARY JUDGMENT

### A. SUMMARY JUDGMENT STANDARDS

We review an order granting summary judgment de novo.[13] *Keck v. Collins*, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). Summary judgment is appropriate if the pleadings, affidavits, depositions, and admissions on file demonstrate the absence of any genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. CR 56(c). A material fact is one on which the outcome of the litigation depends in whole or in part. *Atherton Condo. Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 516, 799 P.2d 250 (1990).

In a summary judgment motion, the moving party, here Gunwall, bears the initial burden of showing the absence of an issue of material fact. *Zonnebloem, LLC v. Blue Bay Holdings, LLC*, 200 Wn. App. 178, 183, 401 P.3d 468 (2017). If the moving party meets this initial burden, then the burden shifts to the plaintiff, here Amelia, to show a genuine issue of material fact. *Portmann v. Herard*, 2 Wn. App. 2d 452, 460, 409 P.3d 1199 (2018). The "nonmoving party cannot rely on conclusory statements or conjecture." *Id.* "If, at this point, the [nonmoving party] 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on

---

[13] Amelia argues that the superior court applied the wrong evidentiary standard when reviewing Gunwall's summary judgment motion by applying the clear, cogent, and convincing burden of proof and, therefore, failing to consider the evidence in the light most favorable to her. We review an order granting summary judgment de novo, so whether the superior court applied the correct review standard is irrelevant. *Keck v. Collins*, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). We note, however, that Amelia's argument conflates the burden of proof with the fact we consider the evidence in the light most favorable to the nonmoving party when reviewing a summary judgment motion. We can consider the evidence in the light most favorable to the nonmoving party and still determine that no rational trier of fact could find this evidence would be sufficient to meet the relevant burden of proof. And, to the extent Amelia is arguing that the clear, cogent, and convincing burden proof is irrelevant to the summary judgment determination in this case, her citation to *Lennon*, 108 Wn. App. at 181, is not persuasive because that case does not address an undue influence claim.

which that party will bear the burden of proof at trial,' then the trial court should grant the motion." *Young v. Key Pharm. Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989) (footnote omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

In addition, "[t]he general principles of summary judgment are supplemented by additional principles when a party claims undue influence." *Kitsap Bank v. Denley*, 177 Wn. App. 559, 569, 312 P.3d 711 (2013). In this context, "the party bearing the burden to prove the undue influence claim at trial must present sufficient evidence to make it highly probable that the undue influence claim will prevail at trial." *Id.* Thus, the superior court "may grant a summary judgment motion to dismiss if no rational trier of fact, viewing the evidence in the light most favorable to the nonmoving party, could find clear, cogent, and convincing evidence on each element." *Id.* at 569-70; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ("[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden.").

B. UNDUE INFLUENCE

Beneficiary designations are part of the investment account contracts. *See* 26B CHERYL C MITCHELL & FERD H. MITCHELL, WASHINGTON PRACTICE: PROBATE LAW AND PRACTICE, § 1:9 (2d ed. 2015). Undue influence is a contract principle. *Denley*, 177 Wn. App. at 570; *see also* RESTATEMENT (SECOND) OF CONTRACTS § 177 (AM. LAW. INST. 1981); 6 WASHINGTON PRACTICE, WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 301.11 cmt. (7th ed. 2019). When examining undue influence claims, we apply the rules for undue influence articulated in the RESTATEMENT (SECOND) OF CONTRACTS § 177 in will and gifts situations. *Denley*, 177 Wn. App. at 570; *In re Estates of Jones*, 170 Wn. App. 594, 606, 287 P.3d 610 (2012).

"Undue influence involves unfair persuasion that seriously impairs the free and competent exercise of judgment." *Jones*, 170 Wn. App. at 606. Generally, Amelia would have the burden of proving the elements of undue influence, but under certain circumstances, there is a presumption of undue influence. *In re Estate of Knowles*, 135 Wn. App. 351, 357, 143 P.3d 864 (2006). Amelia argues that Gunwall failed to overcome this presumption. To determine whether this presumption applies, we examine the *Dean*[14] factors and other contributing factors.[15] *Id.*

The primary *Dean* factors are "(1) a fiduciary or confidential relationship between the testator and the beneficiary, (2) active participation by the beneficiary in preparing or procuring the will, and (3) the beneficiary's receipt of an unusually or unnaturally large part of the estate." *Id.* In addition, we consider " 'the age or condition of health and mental vigor of the testator, the nature or degree of relationship between the testator and the beneficiary, the opportunity for exerting undue influence, and the naturalness or unnaturalness of the will.' " *Id.* (internal quotation marks omitted) (quoting *In re Estate of Reilly*, 78 Wn.2d 623, 647, 479 P.2d 1 (1970)). "The weight of any of such facts will, of course, vary according to the circumstances of the particular case." *Dean*, 194 Wash. at 672. The existence of these factors will not automatically invalidate the action, but they may "raise a presumption of undue influence" that may be sufficient to establish undue influence if not rebutted. *Knowles*, 135 Wn. App. at 357. "[T]he existence of the presumption does not[, however] relieve the . . . challengers of proving undue influence by clear, cogent, and convincing evidence." *Id.*

---

[14] *Dean v Jordan*, 194 Wash. 661, 79 P.2d 331 (1938).

[15] Both parties presume that the *Dean* factors apply here.

The parties do not assert that there was a fiduciary relationship between Mark and Gunwall. Thus, our focus is on whether there was a confidential relationship that would weigh in favor of a presumption of undue influence.

Confidential relationships exist when one person has gained confidence of the other and purports to act or advise with the other's interest in mind. *McCutcheon v. Brownfield*, 2 Wn. App. 348, 356-57, 467 P.2d 868 (1970). At best, the evidence here shows that as of April 4, 2018, Gunwall was living in Mark's residence, caring for Mark's dogs, and possibly assisting Mark by helping him expel Swenson and others. There was absolutely no evidence that Gunwall advised Mark about his finances or any other matters. Thus, this factor does not weigh in favor of the existence of or presumption of undue influence.

We next examine the evidence related to whether Gunwall was an active participant in preparing the beneficiary designation changes. We recognize that there was evidence of failed password attempts on the Fidelity accounts from May 2017 to August 2018, and that Julia testified in her deposition that Mark had told her that, at some unspecified time, other people had his computer passwords and he did not know where his computer was. But there was no evidence that other people, even Gunwall, potentially having access to Mark's computer or attempting to obtain access to Mark's Fidelity accounts influenced Mark's decision to change his Fidelity beneficiary designations from Swenson to Gunwall or that Gunwall was an active participant in that change.[16,]

---

[16] We note that if this was a fraud claim rather than an undue influence claim, this evidence would have different significance.

[17] Because there was no evidence that Gunwall was an active participant in the beneficiary changes, this factor does not weigh in favor of the existence of or a presumption of undue influence.

The third *Dean* factor is whether the beneficiary received an unusually or unnaturally large part of the estate. *Knowles*, 135 Wn. App. at 357. " 'Unusualness' or 'unnaturalness' can be measured by comparison to the [testator's] previous . . . bequests to other beneficiaries." *Mueller v. Wells*, 185 Wn.2d 1, 13, 367 P.3d 580 (2016). It is undisputed that Gunwall, a relative stranger to Mark, would receive a considerable amount of money as the primary beneficiary of the Fidelity accounts. But there is nothing in the record establishing the size of Mark's estate as a whole, so we cannot determine if this is an unusually large part of the estate. *Denley*, 177 Wn. App. at 577-78 (holding that the Estate's failure to present evidence of the value of the entire estate prevented a determination of whether $400,000 was a disproportionally large portion of the estate). Accordingly, this factor does not weigh in favor of a presumption of undue influence.

Additionally, although Mark had health issues that may have placed him in a position of reliance on others more than he otherwise would have been, there was no evidence in the record that Mark relied on Gunwall for anything other than caring for the dogs and premises and assisting Mark by ensuring that Swenson and perhaps others left the premises at Mark's request when the

---

[17] Amelia argues that the superior court erred when it found that Mark "made the 'key strokes' on the respective electronic devices when the best the evidence could show was that such transfers happened by 'someone' making key strokes on the electronic devices in question." Br. of Appellant at 7-8. But this case was decided on summary judgment and the superior court made no such finding.

To the extent Amelia may also be asserting fraud, based on the record before us she did not argue fraud below. This court only considers issues raised on summary judgment before the superior court "to ensure that we engage in the same inquiry as the trial court." *Kave v. McIntosh Ridge Primary Rd. Ass'n*, 198 Wn. App. 812, 823, 394 P.3d 446 (2017). Accordingly, we will not consider this argument in the context of a fraud claim.

beneficiary was changed from Swenson to Gunwall. Later evidence suggests that Mark gradually became more and more dependent on or subject to the whims of those living in his home, including Gunwall, but there is no evidence that this level of reliance influenced Mark's decision to remove Swenson as the primary beneficiary and to replace Swenson with Gunwall, or that Mark did not have the mental capacity to make the beneficiary changes. We note that none of the attorneys Mark met with in March, August, and December 2018, expressed concern about Mark's capacity. Furthermore, even though his sisters expressed concern about Mark, they had no first-hand knowledge of Mark's relationships with the others in his household, especially as early as April 2018. Thus, these factors do not weigh in favor of a presumption of undue influence.

In sum, the evidence presented would not allow a rational trier of fact to find a presumption of undue influence by clear, cogent, and convincing evidence. Nor does the evidence establish a question of fact as to whether Gunwall interfered with Mark's free will, preventing Mark from exercising his own judgment and choice in removing Swenson as the primary beneficiary after Swenson was no longer part of his life and then designating Gunwall as the primary beneficiary of the Fidelity accounts. Accordingly, the superior court did not err when it granted summary judgment and dismissed Amelia's undue influence claim.

C. SLAYER/ABUSER STATUTE

Amelia further argues that the superior court erred in granting Gunwall's summary judgment on the slayer/abuser statute issue. We disagree.

Under RCW 11.84.020, "[n]o slayer or abuser shall in any way acquire any property or receive any benefit as the result of the death of the decedent."[18] Under RCW 11.84.160(1), an "abuser" cannot benefit if there is clear, cogent, and convincing evidence that a "decedent was a *vulnerable adult at the time the alleged financial exploitation took place*," and that "[t]he conduct constituting financial exploitation was willful action or willful inaction causing injury to the property of the vulnerable adult."[19] (Emphasis added.) We hold that Amelia does not show that the evidence established a question of fact as to whether Mark was a vulnerable adult at the time of the alleged financial exploitation or as to whether Gunwall engaged in conduct constituting financial exploitation in obtaining the beneficiary designation changes.

1. VULNERABLE ADULT

For purposes of the slayer/abuser statute, the term "[v]ulnerable adult" has "the same meaning as provided in RCW 74.34.020." RCW 11.84.010(6). Former RCW 74.34.020(22) (2018) defined vulnerable adult as follows:

> "Vulnerable adult" includes a person:
> (a) Sixty years of age or older who has the functional, mental, or physical inability to care for himself or herself; or
> (b) Found incapacitated under chapter 11.88 RCW; or
> (c) Who has a developmental disability as defined under RCW 71A.10.020; or
> (d) Admitted to any facility; or
> (e) Receiving services from home health, hospice, or home care agencies licensed or required to be licensed under chapter 70.127 RCW; or
> (f) Receiving services from an *individual provider*; or
> (g) Who self-directs his or her own care and receives services from a *personal aide* under chapter 74.39 RCW.

---

[18] This includes assets that pass outside of probate. *In re Estate of Haviland*, 177 Wn.2d 68, 76, 301 P.3d 31 (2013).

[19] We note that unlike the abuser determination, the slayer determination does not require that the killing be at the time of the alleged financial exploitation. RCW 11.84.140.

(Emphasis added.) The parties agree that Mark did not qualify as a vulnerable adult under (22)(a) through (e). And we hold that there was similarly no question of fact as to whether Mark qualified as a vulnerable adult under (22)(f) or (g).

To qualify as a vulnerable adult under subsection (f), there must be evidence sufficient to create a question of fact as to whether Gunwall was an "individual provider." Former RCW 74.34.020(22). An individual provider is defined as "a person under contract with the [Department of Social and Health Services] to provide services in the home under chapter 74.09 or 74.39A RCW." Former RCW 74.34.020(11). And there is no evidence establishing a question of fact regarding whether Gunwall was under contract with the department to provide any kind of services to Mark, so Mark cannot qualify as a vulnerable adult under subsection (f).

To qualify as a "personal aid under chapter 74.39 RCW," there must be evidence that Gunwall was someone who provided Mark with "*health care services* that a person without a functional disability can perform." RCW 74.39.007(2) (emphasis added). "Health care tasks" include "medical, nursing, or home health services that enable the person to maintain independence, personal hygiene, and safety in his or her own home." Former RCW 74.39.050(2)(a) (1999). And although a personal aid can provide additional "home care services," "[t]he role of the personal aid in self-directed care is limited to performing the physical aspect of *health care tasks* under the direction of the person for whom the tasks are being done." Former RCW 74.39.050(2)(e) (emphasis added). Although there is evidence that could establish a question of fact as to whether Gunwall may have been providing some home care services as of April 4, 2018, and that Gunwall may have been performing some health care tasks, such as helping Mark get to medical appointments or providing or removing receptacles in which Mark could relieve

himself when he was unwilling or unable to make it to the restroom later that year, there was no evidence that "at the time the alleged financial exploitation took place" Gunwall was providing any *health care* services to Mark. RCW 11.84.160(1). Accordingly, there is no question of fact as to whether Mark could qualify as a vulnerable victim under subsection (g).

2. FINANCIAL EXPLOITATION

In addition to the requirement that Mark be a vulnerable victim, Amelia would also have to prove that there was a question of fact as to whether Gunwall engaged in "conduct constituting financial exploitation" in order for the slayer/abuse statute to apply. *Id.* "Financial exploitation" is "the illegal or improper use, control over, or withholding of the property, income, resources, or trust funds of the vulnerable adult by any person or entity for any person's or entity's profit or advantage other than for the vulnerable adult's profit or advantage. Former RCW 74.34.020(7); RCW 11.84.010(3). Former RCW 74.34.020(7)(a) provides a non-exclusive list of examples of financial exploitation, including

> [t]he use of deception, intimidation, or undue influence by a person or entity in a position of trust and confidence *with a vulnerable adult* to obtain or use the property, income, resources, or trust funds of the vulnerable adult for the benefit of a person or entity other than the vulnerable adult.

(Emphasis added.)

As discussed above, and for the same reasons, there is no evidence establishing that Mark was a vulnerable adult for purposes of the slayer/abuser statute. And, as discussed above, there is no evidence establishing a question of fact as to whether Gunwall was an active participant in preparing the beneficiary designation change, so there is no evidence establishing a question of fact as to whether Gunwall used deception, intimidation, or undue influence in obtaining the beneficiary designation change.

23

Amelia does not show that there are questions of fact as to whether Mark was a vulnerable adult or whether Gunwall engaged in financial exploitation, so the superior court did not err when it granted Gunwall's summary judgment motion on the slayer/abuser statute issue. Accordingly, we affirm the superior court order granting Gunwall's summary judgment motion.

### III. ATTORNEY FEES AND COSTS ON APPEAL

Gunwall asks for attorney fees and costs under RCW 11.96A.150 and RAP 18.1.

RAP 18.1 allows us to award reasonable attorney fees or expenses "[i]f applicable law grants to a party the right to recover" such attorney fees or expenses. RCW 11.96A.150(1) gives us discretion to award "costs, including reasonable attorneys' fees" to any party from any party to the proceeding. "The statute allows a court considering a fee award to consider any relevant factor," and to award costs and fees " 'in such amount . . . as the court determines to be equitable.' " *In re Guardianship of Lamb*, 173 Wn.2d 173, 197-98, 265 P.3d 876 (2011) (quoting RCW 11.96A.150(1)); RCW 11.96A.150(1). Although Gunwall has prevailed on this appeal, we deny his request for appellate attorney fees and costs given the disparate benefit to Gunwall and the equities of the case.

Accordingly, we affirm the superior court's order granting Gunwall's summary judgment motion and deny Gunwall's request for attorneys' fees and costs.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

No. 55461-5-II

CRUSER, J.

We concur:

GLASGOW, C.J.

PRICE, J.

25